# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

———————————————————————— x

ANNE WHITE HAT, RAMON MEJÍA,
and KAREN SAVAGE,

<em>Plaintiffs</em>,

v.

BECKET BREAUX, in his official
capacity as Sheriff of St. Martin Parish;
BOFILL DUHÉ, in his official capacity as District
Attorney of the 16th Judicial District Attorney's
Office,

<em>Defendants</em>.

———————————————————————— X

Civil Action No. 6:20-cv-00983

JUDGE ROBERT R. SUMMERHAYS

MAGISTRATE JUDGE
CAROL B. WHITEHURST

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

PAMELA C. SPEES
La. Bar Roll No. 29679
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Tel and Fax: (212) 614-6431
pspees@ccrjustice.org

WILLIAM QUIGLEY
La. Bar Roll No. 7769
Professor of Law
Loyola University College of Law
7214 St. Charles Avenue
New Orleans, LA 70118
Tel. (504) 710-3074
Fax (504) 861-5440
quigley77@gmail.com

*Counsel for Plaintiffs*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... i

INTRODUCTION, FACTUAL BACKGROUND,
AND SUMMARY OF ARGUMENT ....................................................................... 1

    A.  The Industry's Legislative Attempts to Silence Protesters ........................... 2

    B.  The Vast and Incomprehensible Pipeline Network in Louisiana ................. 4

I.  RULE 56 STANDARDS ..................................................................................... 5

II.  BECAUSE THE STATUTE IS CONTENT-BASED ON ITS FACE
AND TARGETS A PARTICULAR VIEWPOINT, IT IS SUBJECT
TO STRICT SCRUTINY. ..................................................................................... 5

    A.  Because the Legislation Includes a Content-Based Regulation, It Is
Presumptively Unconstitutional. .................................................................... 6

    B.  Because the Statute Was Proposed to Target a Particular Viewpoint
It Is Presumptively Unconstitutional. ............................................................ 8

III.  THE STATUTE CANNOT WITHSTAND STRICT SCRUTINY AND
PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW. ............. 11

    A.  The Statute Is Not 'Actually Necessary.' ..................................................... 12

    B.  The Statute Is Not Narrowly Tailored. ........................................................ 13

IV.  THE STATUTE IS VOID FOR VAGUENESS AND OVERBROAD
AND PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A
MATTER OF LAW. ........................................................................................... 15

    A.  The Law Does Not Provide Adequate Notice of Prohibited Conduct. ......... 16

    B.  The Law Does Not Establish Minimal Guidelines for Law Enforcement. ..... 19

    C.  The Law Encourages Arbitrary and Discriminatory Enforcement
and Has Already Been Arbitrarily and Discriminatorily Enforced. ............. 21

CONCLUSION .................................................................................................... 23

## **TABLE OF AUTHORITIES**

Rules and Statutes | Page(s)

Fed. R. Civ. Proc. 56 ............................................................................ 5

La. C.Cr.P. Art. 572(A)(2) ..................................................................... 3

La. Rev. Stat. § 14:55 ............................................................................ 13

La. Rev. Stat. § 14:56 ............................................................................ 13

La. Rev. Stat. § 14:58 ............................................................................ 13

La. Rev. Stat. § 14:61 ............................................................................ *passim*

La. Rev. Stat. § 14:61.1 ......................................................................... 13

La. R.S. Stat. § 14:63 ............................................................................ 3, 13

Cases

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ........................ 5

*Austin v. Kroger Tex., L.P.,* 864 F.3d 326 (5th Cir. 2017) ................... 5

*Baggett v. Bullitt, 377 U.S. 360, 372 (1964).* ...................................... 15

*Brown v. Entertainment Merchants Assn.,* 564 U.S. 786, 792 (2011) ............ 11, 14

*Chaplin v. Nations Credit Corp.,* 307 F.3d 368 (5th Cir. 2002) .......... 5

*Child Evangelism Fellowship v. Montgomery Cty. Pub. Sch.,*
457 F.3d 376 (4th Cir. 2006) ................................................................. 8

*CISPES v. F.B.I.,* 770 F.2d 468 (5th Cir. 1985) ................................... 21

*City of Chicago v. Morales,* 527 U.S. 41, 90 (1999); .......................... 15, 19, 21

*City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750 (1988) ...... 8

*Forsyth Cty., Ga. v. Nationalist Movement,* 505 U.S. 123 (1992) ...... 8

*Grayned v. City of Rockford,* 408 U.S. 104 (1972) ............................. 16

*Hill v. Colorado,* 530 U.S. 703 (2000) ................................................ 7

*Kolender v. Lawson,* 461 U.S. 352 (1983) ........................................... 15-16, 19, 21

*Lanzetta v. N.J.,* 306 U.S. 451 (1939) ........................................................................... 17

*Louisiana ex rel. Gremillion v. Nat'l Ass'n for the Advancement of Colored People,*
366 U.S. 293 (1961) ........................................................................... 9

*McCullen v. Coakley,* 573 U.S. 464 (2014) ........................................................................... 12, 14

*Nat'l Ass'n for the Advancement of Colored People v. Button,*
371 U.S. 415 (1963) ........................................................................... 9, 15

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992) ........................................................ 8, 13

*Reagan Natl. Advert. of Austin, Inc. v. City of Austin,* 972 F.3d 696 (5th Cir. 2020) ........... 5, 7

*Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155 (2015) ........................................................ 5-7, 9, 11

*Republican Party of Minn. v. White,* 536 U.S. 765 (2002) ........................................................ 14

*Reynolds v. Middleton,* 779 F.3d 222 (4th Cir.2015) ........................................................ 12, 14

*Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819 (1995) ..................... 8-9

*Seals v. McBee,* 898 F.3d 587 (5th Cir.2018) ........................................................ 16, 19

*Smith v. Goguen,* 415 U.S. 566 (1974). ........................................................................... 19

*Texas Ent. Assn., Inc. v. Hegar,* 10 F.4th 495 (5th Cir. 2021). ........................................... 7, 11

*United Food & Commercial Workers Local 99 v. Bennett,*
934 F. Supp. 2d 1167 (D. Ariz. 2013) ........................................................................... 21

*United States v. Alvarez,* 567 U.S. 709 (2012) ........................................................................... 11-12

*United States v. Eichman,* 496 U.S. 310 (1990) ........................................................................... 9

*United States v. Stevens*, 559 U.S. 460 (2010). ........................................................ 15, 16

*Williams-Yulee v. Fla. Bar,* 575 U.S. 433, 444 (2015) ........................................................ 12

*Wright v. State of Ga.*, 373 U.S. 284, 293 (1963) ........................................................ 21

<u>Other Authorities</u>

U.S. Const. Amend. I ........................................................................... *passim*

U.S. Const., Due Process Clause ........................................................................... *passim*

## INTRODUCTION, FACTUAL BACKGROUND
## AND SUMMARY OF ARGUMENT

Louisiana's law prohibiting unauthorized entry on critical infrastructure – as amended in 2018, La. R.S. 14:61 – is unconstitutional. The amendments adding Louisiana's vast networks of pipelines to the previously cabined definition of "critical infrastructure," were enacted at the instigation of leaders of the oil and gas industry as a direct response to ongoing and increasing, peaceful protests by environmental justice activists against pipeline projects and to squelch their messaging about the contribution of fossil fuels to devastating climate change and to the health of local communities. The most glaring and facially obvious problem with the law is the incorporation of pipelines into the definition of critical infrastructure without limitation or guidance as to what area around a pipeline is covered by the law, which renders the statutory amendment unconstitutionally vague and overbroad in violation of due process. In addition, because the statute was designed to target expressive activity critical of the environmental destruction pipelines can cause, it represents a form of viewpoint discrimination that is presumptively unconstitutional under the First Amendment.

The statute is so vaguely and expansively drafted and so obviously limits the content of speech and the viewpoint of pipeline opponents, it suffers from several interrelated and overlapping fundamental constitutional flaws. First, the Statute includes a carve-out for expressive activity, permitting a future decisionmaker to determine whether speech occurring on that property is a "legitimate matter of public interest." Vesting this unbridled discretion in a government official not only violates due process, it opens the door to favoring some as yet undetermined speech content over others and is thus a presumptively unconstitutional content-based regulation. Second, the undisputed facts – including the context in which the legislation was drafted, the political agenda of the drafters of the legislation, the legislation's vagueness and

breadth, and later, the discriminatory application of the statute – demonstrate that the statute was designed to target and deter speech critical of pipeline activity. Such content regulation and viewpoint discrimination mandate strict judicial scrutiny, which the Statute cannot meet. Finally, and perhaps most obviously, the incorporation of a vast, indecipherable network of pipelines into the definition of critical infrastructure without limiting guidance for law enforcement, renders the statute unconstitutional vague and overbroad in violation of due process.

The court should grant Plaintiffs summary judgment and declare the 2018 amendments unconstitutional.

### A.  The Industry's Legislative Attempts to Silence Pipeline Critics

In 2018, at a high point of high-profile protests drawing local and national media attention, against the controversial Bayou Bridge Pipeline ("BBP"), which forms the southern end of the same network of pipelines as the also-controversial Dakota Access Pipeline at Standing Rock, the general counsel of the Louisiana Mid-Continent Oil and Gas Association (LMOGA) drafted and pushed legislation to deter and punish certain protestors. Statement of Facts ("SOF") ¶¶ 10-11, 15-20, 24-26.  The protests drew national attention. SOF ¶ 11. Many environmental activists – like other civil rights protestors historically – believe protests are most significant and effective when located near or around areas they believe produce the injustice they seek to remedy – like lunch counters. In this case, environmental justice activists drawing attention to the contribution of fossil fuels to climate change and the health and welfare of local and global populations situated protests around areas associated with pipeline expansion. SOF ¶ 43.

Industry spokespeople heralded the Louisiana law – itself modeled on legislation in Oklahoma sponsored by LMOGA's counterpart there – as a way of suppressing peaceful protest

activity. SOF ¶¶ 21-23. LMOGA and the legislation's sponsors sought to assure lawmakers that the proposed bill would not affect protests but was instead aimed at physical damage to pipelines and other infrastructure and that such damage was necessary to "trigger" the law. SOF ¶¶ 33-34, 38. This was a pretext. The resulting law makes no mention of physical damage, nor does it require a showing of an intent or attempt to do so: it simply prohibits physical, albeit unauthorized, presence on a vast networks of Louisiana pipelines, now denominated as "critical infrastructure." La. R.S. 14:61.

Just weeks after the amendments went into effect, environmental activists opposed to BBP, including Plaintiffs Anne White Hat and Ramon Mejía, who and Karen Savage, a journalist covering the protests, were arrested and charged with felonies punishable by up to five years under the law. SOF ¶¶ 79-101. Until the time for prescription period runs, they are still susceptible to prosecution.[1] They were each attempting to comply with the law, even though they believed it illegal and unjust. SOF ¶ 81. Indeed, the property landowners gave them permission to be on the property. SOF ¶ 58. Those landowners also opposed Bayou Bridge's presence on their property and made that known to law enforcement and state officials. SOF ¶ 62-64.

Plaintiffs were arrested and charged with felonies under the law for allegedly remaining on a pipeline right of way – even though it did not legally exist, as it was later determined by a state court that the pipeline company was knowingly, flagrantly trespassing at the time. SOF ¶¶ 72-84.  Prior to the 2018 amendments, their alleged actions, remaining after being forbidden on private property, would have resulted in misdemeanor charges under La. R.S. 14:63 – charges which would have likely been rejected or dismissed since they had permission of a landowner.

---

[1] La. C.Cr.P. art. 572(A)(2) provides for a time limitation of four years. Defendant Duhé rejected the charges and disavowed prosecution on July 7, 2021, after this Court's ruling denying defendants' motions to dismiss. SOF ¶ 116.

**B.  The Vast and Incomprehensible Pipeline Network in Louisiana**

There are over 125,000 miles of oil and gas pipelines in the state of Louisiana. SOF ¶ 1. Most of these pipelines are underground or underwater, not visible to those standing above ground or on boats or other waterborne vessels and are often not clearly marked or not marked as to their exact location. SOF ¶¶ 2-8. Some are under private property of those who oppose pipeline expansion and cede permission to activists to protest on their land.  SOF ¶ 60. Federal and state agencies have acknowledged that even when hazardous pipelines are marked as required, the markers do not indicate the exact location of pipelines. SOF ¶¶ 3-8. Researchers with the Louisiana Geological Survey have reported that much of the state's pipeline data and maps are outdated and inaccurate; they even noted "phantom" pipelines and crossings on maps that do not actually exist. SOF ¶ 3. Even national pipeline maps are only accurate to within "+/- 500 feet." SOF ¶ 4. The Pipeline Hazardous Materials and Safety Administration ("PHMSA") reports that the "root causes" of damage during excavation are insufficient "locating practices" and one-call notification practices. SOF ¶ 9. In addition to oil and gas pipelines, the statute also encompasses unknown number of miles of pipelines transporting water and other minerals. La. R.S. 14:61(B)(3).

As is to be expected with such a vague law, state officials tasked with enforcement of the law differ as to what area around a pipeline is covered by the law. The Louisiana Attorney General and District Attorney of the 16th Judicial District differ as to the proscribed area, SOF ¶¶ 110-115, as do the officers who arrested the plaintiffs. SOF ¶ ¶ 117-121. This vagueness and overbreadth render the law susceptible to arbitrary and discriminatory enforcement.

Indeed, as Plaintiffs' arrests show, it already has been enforced in an arbitrary and discriminatory way. The Plaintiffs were arrested at the request of BBP, which was itself

trespassing, by St. Martin Parish Sheriff's Office employees working a private security detail for the trespassing company at the time they made the arrests, SOF ¶¶ 74-77, and despite the fact that protestors and two landowners alerted the sheriff's office and other state officials their office that the protesters had permission to be there, and the pipeline company did not. SOF ¶¶ 62-65.

As set forth below, the undisputed facts demonstrate that the statute is vague and overbroad in violation of due process and targets a particular viewpoint for harsher punishment and chills expression in violation of the First Amendment. It cannot survive strict scrutiny because it does come close to being narrowly tailored to achieve a compelling state interest. Plaintiffs are entitled to judgment as a matter of law.

## I.   RULE 56 STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When reviewing a summary judgment motion, all justifiable inferences are to be drawn in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). A movant who bears the ultimate burden of proof must establish all the essential elements of the claim that warrant judgment in their favor. *See Chaplin v. Nations Credit Corp.,* 307 F.3d 368, 372 (5th Cir. 2002).  The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Austin v. Kroger Tex., L.P.,* 864 F.3d 326, 335 (5th Cir. 2017).

## II.   BECAUSE THE STATUTE IS CONTENT-BASED ON ITS FACE AND TARGETS A PARTICULAR VIEWPOINT, IT IS SUBJECT TO STRICT SCRUTINY.

It is well settled law that statutes that are content-based or that discriminate on the basis of viewpoint are presumptively unconstitutional and can be saved only if they survive strict scrutiny. *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 163 (2015). *See also, Reagan Natl.*

*Advert. of Austin, Inc. v. City of Austin,* 972 F.3d 696, 705-7 (5th Cir. 2020), *cert. granted sub nom. City of Austin, Texas v. Reagan Natl. Advert. of Texas, Incorporate,* 141 S. Ct. 2849 (2021). First, a court must determine whether the law "on its face draws distinctions based on the message a speaker conveys." *Id.* If it does not, then the court must determine whether the "cannot be justified without reference to the content of the regulated speech" or if it was "adopted by the government because of disagreement with the message the speech conveys." *Id.* at 164. In either case, strict scrutiny applies.

### A. Because the Legislation Includes a Content-Based Regulation, It Is Presumptively Unconstitutional.

On its face, the statute explicitly concerns itself with expressive conduct. La. R.S. 14:61(D)(1) and (2) condone "lawful" petitioning activity on "legitimate matters of public interest" including "any labor dispute between any employer and its employee," and "a position protected by the United States Constitution or Constitution of Louisiana" and "commercial or recreational activities." To be sure, as described below, handing such broad discretion to a government official to ascertain what is "legitimate" speech and what is not legitimate speech strikes at the heart of the due process clause's prohibition of vague and arbitrary legislation, *see infra*. But the statute commits a First Amendment offense as well by authorizing delineations on the content of speech; that is, even if we do not know from the face of the statute know what speech is legitimate and what is not, we *do know* the statute will authorize *some speech* content while prohibiting other speech content at the discretion of some future government decisionmaker. The Statute thus makes "distinctions based on the message a speaker conveys" or the "function or purpose" of speech on its face and must be subject to strict scrutiny. *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 163 (2015) ("Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle,

defining regulated speech by its function or purpose."). *See also, Texas Ent. Assn., Inc. v. Hegar,* 10 F.4th 495, 509 (5th Cir. 2021).

The statute requires an authorized person or government official to inquire into the content or purpose of the speech and determine whether it constitutes a "legitimate matter of public interest," a position protected by the United States or Louisiana constitutions, or commercial or recreational activity. In interpreting and applying *Reed*, the Fifth Circuit Court of Appeals held that even "cursory" inquiries into the content of speech in application of a law that on its face implicates speech will render that law content-based – not content-neutral – and subject it to strict scrutiny. *Reagan Natl. Advert. of Austin, Inc. v. City of Austin,* 972 F.3d 696, 705-7 (5th Cir. 2020), *cert. granted sub nom. City of Austin, Texas v. Reagan Natl. Advert. of Texas, Incorporate,* 141 S. Ct. 2849 (2021) ("The fact that a government official had to read a sign's message to determine the sign's purpose was enough to subject the law to strict scrutiny even though the sign's location was also involved."). *See also, Hill v. Colorado*, 530 U.S. 703, 720 (2000) (government regulation of expressive activity is "content neutral" only if it is justified without reference to the content of regulated speech).

This holds true even when the government's motive is benign and its justification is content-neutral. *Reed* at 165-67 ("The vice of content-based legislation is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes.") (internal citations and quotations omitted). In *Reed*, the Supreme Court emphasized the problem that arises when officials must inquire into content when enforcing a content-based law: "[O]ne could easily imagine a Sign Code compliance manager who disliked the Church's substantive teachings deploying the Sign Code to make it more difficult for the Church to inform the public of the location of its services." *Reed* at 167-78.

For this reason, the "the danger of content and viewpoint censorship… is at its zenith when the determination of who may speak and who may not is left to an official's unbridled discretion." *City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 751 (1988). *See also, Forsyth Cty., Ga. v. Nationalist Movement,* 505 U.S. 123, 130 (1992); *Cox v. State of La.,* 379 U.S. 536, 557–58 (1965); *see also, Child Evangelism Fellowship v. Montgomery Cty. Pub. Sch.,* 457 F.3d 376, 386 (4th Cir. 2006) (vesting someone with "unbridled discretion" is a means "to hide unconstitutional viewpoint discrimination") (collecting cases).

The critical infrastructure law vests "any owner, lessee, or custodian" of the property or by any other "authorized person" with the authority to determine what kind of expression is permissible and to forbid anyone from "remaining upon or in the premises of a critical infrastructure," La. R.S. 14:61(A)(3). Critical infrastructure, as it relates to pipelines, could be on public or private property, visible or invisible, a public park, sidewalk, or waterway. The statute grants this authority to government officials, to determine what is a "legitimate matter of public interest," a protected position under the federal and state constitutions, or a permissible commercial or recreational activity.

The law is content-based on its face and must be subject to strict scrutiny.

### B. Because the Statute Was Proposed to Target a Particular Viewpoint It Is Presumptively Unconstitutional.

The Statute is also subject to strict scrutiny because it targets a particular viewpoint for harsher punishment. "Viewpoint discrimination is [..] an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819, 829 (1995). The First Amendment "does not permit [a government] to impose special prohibitions on those speakers who express views on disfavored subjects." *R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 391 (1992). If a law is content-neutral on its face, the court may examine the law's

"justification or purpose." *Reed, supra* at 166. A law that contains no "explicit content-based limitation on the scope of prohibited conduct" may nevertheless be unconstitutional if "the Government's interest is related to the suppression of free expression." *United States v. Eichman,* 496 U.S. 310, 315 (1990) (federal flag burning law could not withstand strict scrutiny even though facially neutral because government's interest was in "suppression of free expression"). *See also, Nat'l Ass'n for the Advancement of Colored People v. Button,* 371 U.S. 415 (1963) (state may not ignore First Amendment rights under "guise of prohibiting professional misconduct by attorneys"); *Louisiana ex rel. Gremillion v. Nat'l Ass'n for the Advancement of Colored People,* 366 U.S. 293, 297 (1961) (regulatory measures could not be employed "in purpose or effect to stifle, penalize, or curb the exercise of First Amendment rights"). *See also, Rosenberger,* 515 U.S. at 829 (government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction").

Here, the evidence of viewpoint discrimination is manifest. First, the 2018 amendments to the critical infrastructure law were introduced at a time when environmental activists' challenges to the dangers of pipeline activity were on the rise. SOF ¶¶ 10-15. In response, a series of critical infrastructure bills were introduced across the country targeting protests against pipelines. SOF ¶¶ 15-23. Second, the legislative response was initiated by leaders of the oil and gas industry who have obviously vested and financial interest in skewing the debate about the dangers of continued pipeline expansion. SOF ¶¶ 15-23, 25. In Louisiana, the Statute was drafted by Tyler Gray, then general counsel and later President of the Louisiana Mid-Continental Oil and Gas Association, which "exclusively represent[s] all sectors of the oil and gas industry operating in Louisiana and the Gulf of Mexico." SOF ¶¶ 24-26, 32. Gray

admitted that the Statute followed Oklahoma's model, the sponsor of which admitted that it was enacted in response to the Dakota Access Pipeline protests. SOF ¶¶ 16-18, 26, 37. Oil and gas industry associations also acknowledged the Louisiana statute was aimed at "anti-pipeline protestors across the country who have opposed the permitted construction of energy infrastructure projects" when commenting in support of the law. SOF ¶¶ 21-23.

Third, the Statute's terms effectively target pipeline protesters. While the bill's legislative sponsors claim the legislation was introduced to prevent property damage to pipelines and assured their fellow lawmakers that the law would only be triggered when there was damage, that claim is belied by the political context and origins of the bill and the resulting law, as well as by statements that revealed its true purpose. The claim that the intention behind the bill was not to limit speech is factually false. The bill's lead sponsor, Rep. Major Thibaut, explained to the Senate Judiciary Committee that the bill "does nothing to impact the ability to peacefully protest. It only comes into play when there is damage to that critical infrastructure, so if you don't damage anything, this law does not apply." SOF ¶¶ 34-35.

The origins of the amendments tell a different story, as does the end result – the statute makes no mention of damage, or any intent to cause damage.  Neither Representative Thibaut nor his co-sponsor, nor the bill's drafter, offered any guidance or insight, much less evidence, as to the need to so dramatically enhance the penalties for mere presence on or near a pipeline or how adding the state's vast networks of pipelines and undefined areas around them to the definition of critical infrastructure would further that concern. It is clear from the bill's origins and from statements made by the bill's author and legislative sponsors in committee testimony that the true purpose of the bill was to discourage pipeline protesters.

In sum, undisputed facts demonstrate that the law was intended to target and limit

environmental activists from protesting in opposition to pipelines where such protests are expressively symbolic because: (1) the impetus for the law arose from increasing public protests of pipeline activity, SOF ¶¶ 10-23; (2) the predicate Oklahoma law, and then the more restrictive Louisiana law that followed, were drafted by and advocated for, leading Oil and Gas industry activists, not for any neutral legislative purpose but to tilt the public dialog to the advantage of pipeline activity, SOF ¶¶ 15-20, 24-26; (3) the text of the statute is intentionally expansive and does not limit punishment to expressively neutral conduct such as property damage, La. R.S. 14:61; (4) it has, in fact, been carried out in a discriminatory manner, in order to punish allegedly trespassing protestors, but not punishing trespassing industry actors, SOF ¶¶ 56-81.

As a form of viewpoint discrimination, the Statute must be subject to strict scrutiny.

III. **THE STATUTE CANNOT WITHSTAND STRICT SCRUTINY AND PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

Because the Statute is content-based and viewpoint discriminatory, it is presumptively invalid and can only be justified "only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert,* 576 U.S. at 163; *Texas Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 509 (5th Cir. 2021) (citing *Reed*). Under the first prong of strict scrutiny, the statute must be "actually necessary to achieve" a compelling interest. *United States v. Alvarez,* 567 U.S. 709, 725 (2012) citing *Brown v. Entertainment Merchants Assn.,* 564 U.S. 786, 792 (2011). Second, the statute must be "narrowly tailored to achieve that interest." *Reed*, at 171 (2015) (citations omitted). This is a demanding standard and "it is the rare case in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest." *Williams-Yulee v. Fla. Bar,* 575 U.S. 433, 444 (2015).[2]

_____

[2] Even if the Statute were deemed "content-neutral," it would fail the intermediate scrutiny applied to such laws because for the same reasons set out in this brief. That level of scrutiny

## A.  The Statute Is Not 'Actually Necessary.'

The state may not regulate speech where it "has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from" activities protected by the first Amendment. *McCullen v. Coakley,* 573 U.S. 464, 494 (2014). In order for a Statute to be deemed "actually necessary," the government must establish there are no alternative means that would suffice to "achieve its interest." *Alvarez*, 567 U.S. at 726. Moreover, "[g]iven the vital First Amendment interests at stake, it is not enough for [the government] simply to say that other approaches have not worked." *McCullen*, 573 U.S. at 496. Rather, "the government must show that it seriously undertook to address the problem with less intrusive tools readily available to it." *Reynolds v. Middleton,* 779 F.3d 222, 231 (4th Cir.2015) (quoting *McCullen*).

The bill's author and legislative sponsors defended the proposed amendments as being necessary to prevent damage to pipelines, and even argued that the law as amended would only be "triggered" by property damage. SOF ¶¶ 34-35, 38. However, La. R.S. 14:61 as amended in 2018 does not require or even mention property damage as a threshold at all; it does not require or even reference an intent to cause damage. It plainly subjects someone to up to five years in prison for merely being present on, i.e. remaining "upon or in the premises of," a "pipeline" after being forbidden.

The state already had a "variety of approaches" available to it that were capable of serving the purported interest to prevent damage, and with harsher penalties than La R.S. 14:61. For instance, La. R.S. 14:55 prohibits "prohibits aggravated criminal damage to property" and

---

requires that the law be "narrowly tailored to serve a significant governmental interest." *McCullen v. Coakley,* 573 U.S. 477, 466 (2014).

carries a sentence of imprisonment of up to fifteen years. La. R.S. 14:56 prohibits "simple criminal damage to property" and carries sentences ranging from six months up to ten years, depending on the amount of damage caused. La. R.S. 14:58 prohibits "contaminating water supplies" and carries sentences of imprisonment of up to five or 20 years, depending on whether the acts foreseeably endanger the life or health of human beings. Even though the proponents of the legislation did not identify any specific need or interest for more legislation to prevent trespass or remaining after being forbidden, La. R.S. 14:63, the general criminal trespass statute, and La. R.S. 14:63.3 prohibiting "entry on or remaining in places or on land after being forbidden" were also available. The 2018 amendment package also included the provision prohibiting damage to critical infrastructure, which became La. R.S. 14:61.1, carrying sentences of up to fifteen years or twenty years depending on whether it is foreseeable that human life would be threatened or operations of a critical infrastructure would be disrupted.

Thus, the 2018 amendments to La. 14:61 dramatically enhancing the penalties for remaining upon or in the premises of a pipeline to up to five years imprisonment were not "actually necessary." This fact reinforces the evidence that the amendments were really a means of chilling pipeline protests.  The Supreme Court has recognized that the "existence of adequate content-neutral alternatives thus undercuts significantly any defense of such a statute" and "cast[s] considerable doubt on the government's protestations that the asserted justification is in fact an accurate description of the purpose and effect of the law."  *R.A.V. v. City of St. Paul,* 505 U.S. 377, 396 (1992) (citations omitted).

### B.  The Statute Is Not Narrowly Tailored.

The 2018 amendments to La. 14:61 dramatically enhancing the penalties for remaining upon or in the premises of a pipeline to up to five years imprisonment were not actually

necessary. Even if they were, the Statute is not narrowly tailored to serve the purported interest

claimed by the bill's sponsors. "To meet the requirement of narrow tailoring, the government

must demonstrate that alternative measures that burden substantially less speech would fail to

achieve the government's interests, not simply that the chosen route is easier." *McCullen v.*

*Coakley,* 573 U.S. 464, 495 (2014). To show that the Statute is narrowly tailored, the

government "must demonstrate that it does not unnecessarily circumscribe protected

expression." *Republican Party of Minn. v. White,* 536 U.S. 765, 775 (2002) (internal quotations

omitted). *See also Brown v. Ent. Merchants Ass'n,* 564 U.S. 786, 805 (2011) (the government

may only burden First Amendment rights by "means that are neither seriously underinclusive nor

seriously overinclusive").

The 2018 amendments "unnecessarily circumscribe protected expression" and are

therefore overinclusive and overbroad. *See Reynolds v. Middleton*, 779 F.3d 222, 231 (4th Cir.

2015) (invalidating ordinance that applied to "all County roads, regardless of location or traffic

volume. thus 'prohibit[ing] *all* [expressive conduct] even where those activities would not be

dangerous").  Notably, neither the bill's author nor the legislative sponsors offered any evidence

that justified felonizing mere presence after being forbidden from the premises of pipeline. At

most, the legislative sponsors of the bill generically invoked the importance of critical

infrastructure with the lead sponsor. (Spees Decl. Ex. M). Neither Thibaut nor his legislative co-

sponsor, nor their LMOGA counterpart, offered any actual evidence of the need for the bill nor

evidence or insight as to how dramatically escalating the punishment for mere presence after

being forbidden from the premises around a pipeline would further their asserted purpose. *Id.*

The bill's sponsors and the legislature fell far short of what is required to demonstrate

that "alternate measures that burden substantially less speech would fail to achieve the

government's interests." *McCullen,* 573 U.S. at 495. With over 125,000 miles of oil and gas pipelines in the state of Louisiana, plus an unknown number of miles of pipelines carrying water and other minerals, the state enacted a dramatically overbroad statute and a "substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). By subjecting anyone in Louisiana to up to five years imprisonment at hard labor for merely being on the premises of a pipeline after being forbidden, without providing *any* evidence of the necessity for such a dramatic enhancement of the previous penalty, the legislature failed in its duty to prove a compelling interest and that the penalty enhancement was narrowly tailored to achieve that interest.

IV.   **THE STATUTE IS VOID FOR VAGUENESS AND OVERBROAD AND PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

A law is unconstitutionally vague when it "(1) fails to apprise persons of ordinary intelligence of the prohibited conduct, or (2) encourages arbitrary and discriminatory enforcement." *City of Chicago v. Morales,* 527 U.S. 41, 90 (1999); *see also, Kolender v. Lawson,* 461 U.S. 352, 357 (1983). The "vice of unconstitutional vagueness is further aggravated where, as here, the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution." *Baggett v. Bullitt,* 377 U.S. 360, 372 (1964). Where First Amendment rights are involved, the Supreme Court has held that the "standards for permissible vagueness are strict." *NAACP v. Button*, 371 U.S. at 432, 438 ("Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area touching our most precious freedoms.")  "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone… than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford,* 408 U.S. 104, 109 (1972) (internal citations and

quotations omitted); *See also, Kolender,* 461 U.S. at 358 (noting concern that identification requirement in law governing stops by police had "potential for arbitrarily suppressing First Amendment liberties").

The Statute is also overbroad in that it "encompasses a substantial number of unconstitutional applications 'judged in relation to the statute's plainly legitimate sweep.'" *Seals v. McBee,* 898 F.3d 587, 593 (5th Cir. 2018), *as revised* (Aug. 9, 2018) citing *United States v. Stevens*, 559 U.S. 460, 473 (2010).

La. R.S. 14:61, as amended, fails each of these tests. The undisputed facts and the various inconsistent interpretations of the law from law enforcement officials demonstrate the Statute being challenged is vague and overbroad, and has already been unconstitutionally applied. Even officials tasked with the enforcement of this law are uncertain and inconsistent as to the law's parameters.

### A. The Law Does Not Provide Adequate Notice of Prohibited Conduct.

The law turns vast, unmarked stretches of Louisiana into critical infrastructure and exposes individuals to up to five years' imprisonment for remaining on such infrastructure after being forbidden by "authorized persons." In particular, La. R.S. 14:61(A)(3) punishes "[r]emaining upon or in the premises of a critical infrastructure after having been forbidden to do so, either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person" but does not define what "premises" means when it comes to pipelines or identify who constitutes an "authorized person."

There are over 125,000 miles of oil and gas pipelines in Louisiana, much of which are underground and invisible, often not clearly marked, running through private and public land, water ways, wetlands, under public streets, sidewalks, parks, and other public spaces. SOF ¶¶ 1-

9. The U.S. Pipeline and Hazardous Materials Safety Administration ("PHMSA") has noted that even for those hazardous pipelines that are marked, the markers do not indicate the pipeline's exact location. SOF ¶¶ 4, 7-8. The Louisiana Geological Survey agency has acknowledged that Louisiana's pipeline maps and data are inaccurate, even noting "phantom" pipelines on maps that do not actually exist. SOF ¶¶ 3-6. PHMSA has reported that inaccurate location data have been one of the primary root causes of accidents related to excavation activity. SOF ¶ 9.

As a result, the phrase "upon or in the premises of" becomes vague and incomprehensible when applied to pipelines and therefore does not – cannot – provide adequate notice to those who could be subject to the law and exposed to up to five years' imprisonment. *Lanzetta v. N.J.,* 306 U.S. 451, 453 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."). Every other type of critical infrastructure encompassed by the statute consists of an identifiable, above-ground facility that is often enclosed by a "physical barrier" and posted with notices to the public. La. R.S. 14:61(A)(1) and (B)(1).

Plaintiffs were arrested under the Statute after they had attempted to comply with it, even though they believed it unjust and inapplicable to the property where the events took place because the pipeline company itself was trespassing. SOF ¶¶ 81. On August 18, 2018, Mejía and Savage were standing under a tree and away from the area they thought was the pipeline's company's purported right of way. SOF ¶¶ 82-88. They were charged with violating La. R.S. 14:61 anyway, after Sgt. Chris Martin "eyeballed" the end of the "right of way" from about 50 yards away. SOF ¶ 87. Notably, Martin had not been on the site when Mejía and Savage were arrested and had not seen exactly where they were standing. SOF ¶ 88.

White Hat and Savage were arrested on September 18, 2018 – two weeks after they allegedly violated 14:61, again on the non-existent right of way. SOF ¶ 89. On September 3,

2018, both White Hat and Savage state that they attempted to comply with instructions and moved off of the purported right of way. SOF ¶ 81. In fact, the deputy's affidavit acknowledges they moved off the right of way. SOF ¶ 87. Yet he obtained an arrest warrant after the fact and arrested them two weeks later at a public boat launch. SOF ¶ 89.

The law's vagueness and harsh penalties have also acted as a restraint on other environmental activists and advocates. The Louisiana Bucket Brigade is a non-profit health and justice organization that works with communities in Louisiana located near oil refineries and chemical plants. SOF ¶¶ 106-107. They also filmed interviews and activities near such sites, and attempted to document violations. SOF ¶ 108. Bucket Brigade staff, members, volunteers, and community partners protested the Bayou Bridge Pipeline. SOF ¶ 108. They were threated at times by security personnel and law enforcement. SOF ¶ 108. When the law went into effect, Bucket Brigade staff, members, volunteers, and community partners were forced to explore other ways of doing their work and calling attention to the issue because they were concerned about the possibility of felony arrests. SOF ¶ 109..

The Statute also does not define sufficiently who constitutes an "authorized person" for purposes of revoking permission to remain present on the premises of a pipeline. Even legislators considering the amendments in 2018 appeared concerned and confused about who could be deemed an authorized person when it came to pipeline rights of way on private property, though admittedly that did not prevent the legislation from passing into law. SOF ¶ 38 (querying who has the authority under the Statute between property owners and usufructs).  Landowner Peter Aaslestad, who co-owns the property where Plaintiffs were arrested and who sued Bayou Bridge for trespassing, is understandably unclear about what authority he has to determine who can remain on his land and even whether he could be forbidden from the "premises" of the pipeline

on his land by the company and subject to a felony carrying five years' imprisonment. Declaration of Peter Aaslestad, ¶ 18.

This vagueness and open-endedness also renders the Statute overbroad. The bill's drafter and legislative sponsors argued that the amendments were needed to prevent damage to pipelines and that damage was required to trigger the statute. SOF ¶¶ 34-36. But the law as written does not require or mention damage or any intent to cause it.  Even accepting that justification as a basis for the law, the Statute does not address that concern; instead, it "encompasses" and creates very harsh penalties for "a substantial number of unconstitutional applications." *Seals v. McBee,* 898 F.3d at 593.

### B.  The Law Does Not Establish Minimal Guidelines for Law Enforcement.

The Supreme Court has stressed the importance of the guidance required in criminal statutes, noting that the "requirement that a legislature establish minimal guidelines to govern law enforcement" is even more important than actual notice of prohibited conduct. *Kolender v. Lawson,* 461 U.S. 352, 358 (1983) (striking down law requiring "credible and reliable" forms of identification because it vested police with too much discretion and "entrusts lawmaking to the moment-to-moment judgment of the policeman.") (internal quotations omitted). Where the legislature "fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." *Id.* citing *Smith v. Goguen,* 415 U.S. 566 (1974). *See also, Morales,* 527 U.S. at 60 (striking down as facially invalid a loitering statute in part because it lacked minimal guidelines to govern law enforcement).

The previous briefs of state officials in this litigation are particularly concerning evidence of the Statute's vagueness and vulnerability to dangerously expansive interpretations. In earlier

briefing in this litigation, the Louisiana Attorney General understood "premises" to be a "tract of land" where a pipeline either "exists, or does not" and he suggested that this fact is ascertainable (though he does not say how nor point to any provision in the statute that offers guidance). Dkt. 30-1, at 14. Further, he suggested "a person" is either "present on that tract or is not" and has "been forbidden from remaining or not." *Id*. If his assessment is given credence, then "premises" for the Bayou Bridge Pipeline, as an example, would include the entirety of each tract of land through which the 163-mile pipeline runs. When applied to the 125,000 miles of pipeline in this state, his position would convert even larger swathes of this state into critical infrastructure. Defendant Duhé, district attorney of the 16th judicial district court, stated in previous briefing that the "premises" can be determined for the parcel of land where plaintiffs were arrested by referring to the judgment and easement that resulted after the expropriation trial. Dkt. 64-1 at 17-18. However, the judgment Duhé referenced was entered into *after* the Plaintiffs were arrested. Dkt. 30-7.

The deputies involved in the arrests of plaintiffs also had differing views as to what area is covered by the law. Deputy Bonvillain, who obtained the arrest warrants for Savage and White Hat for incidents that took place on September, 3, 2018, was asked in a deposition how he would determine if someone is violating the law at a pipeline that has already been built and is underground. He testified, "Again, I would need a complaint of trespassing, which is what we had, and it's a marked area." SOF ¶118.  Deputy Martin, who was involved in the arrests of Savage and Mejía on August 18, 2018, testified that he would not enforce the statute on a pipeline that was underground and not clearly marked because he believed the statute required that critical infrastructure be clearly marked. SOF ¶ 119 ("...from what I could remember there were several subsections that said it had to be clearly marked, designated, fenced off, where

20

somebody would now it was a restricted area and not just a pipeline or under construction. And if

none of those applied you wouldn't be able to apply that statute to that crime.").  Deputy

Gauthier, also involved in the arrests of Savage and Mejía on August 18, 2018, testified as to his

uncertainty about how to enforce the law. SOF ¶¶ 120-121.

### C.  The Law Encourages Arbitrary and Discriminatory Enforcement and Has Already Been Arbitrarily and Discriminatorily Enforced.

As in *Kolender* and *Morales*, there are no guidelines in La. R.S. 14:61 to govern law

enforcement when it comes to the provision prohibiting individuals from remaining "upon or in

the premises of a critical infrastructure" after being forbidden, or even concerning who is

authorized to forbid. That individuals may receive a "command forbidding [them] from

remaining on the premises of a pipeline," does not ameliorate the vagueness problems. *See*

*Wright v. State of Ga.*, 373 U.S. 284, 293 (1963) (warning not sufficient when a generally

worded statute, construed to punish conduct which cannot be constitutionally punished, is

unconstitutionally vague). *See also Morales*, 527 U.S. at 59-60. Nor do the purported carveouts

at La. R.S. 14:61(D) constitute minimal guidelines for law enforcement, particularly given the

statute's vagueness as to the area covered by the law, because they merely restate "already-

existing constitutional limits on any government activity." *United Food & Commercial Workers*

*Local 99 v. Bennett,* 934 F. Supp. 2d 1167, 1207 (D. Ariz. 2013); *See also, CISPES v. F.B.I.*, 770

F.2d 468, 474 (5th Cir. 1985) (such clauses "cannot substantively operate to save an otherwise

invalid statute, since [they are] a mere restatement of well-settled constitutional restrictions on

the construction of statutory enactments"). Moreover, as already discussed, the provision

requires government officials to inquire into the content of speech and make an assessment as to

whether it constitutes a "legitimate matter of public interest."

21

The Statute's problems with facial vagueness are amply illustrated by the fact that it has already been arbitrarily and discriminatorily enforced. Plaintiffs White Hat, Savage, and Mejía were arrested for violating the law where there was no legally existent critical infrastructure – so the law should not have been invoked in the first place. SOF ¶¶ 71-76, 82-101. BBP was present on the property illegally at the time of the arrests, as was confirmed in the expropriation proceeding. SOF ¶¶ 73-75. Even though the company was trespassing, it was directing law enforcement to have protesters and others arrested. SOF ¶¶66-67, 69. The warrant affidavits and testimony of the arresting officers further demonstrate how the law was arbitrarily and discriminatorily enforced against the Plaintiffs. When asked whether they would have charged Plaintiffs with violating La. R.S. 14:61 had they known that the pipeline company – which was employing them at the time – was trespassing, they each had different answers: Sgt. Martin said it would have made a difference to him, SOF ¶ 125; Sgt. Bonvillain said it would not have made a difference to him, SOF ¶ 122-23; Capt. Gauthier said he was not sure. SOF ¶ 127.

These mixed reactions and understandings as to the reach of the Statute are to be expected with a law as constitutionally deficient and vague as La. R.S. 14:61. Which is why the Statute is such a dangerous and serious threat to liberty, due process, and First Amendment freedoms.

**CONCLUSION**

The Plaintiffs are entitled to judgment as a matter of law. This Court should hold that the

2018 amendment of pipelines into the definition of critical infrastructure in La. R.S. 14:61

violates the First Amendment and Due Process Clause.


Date: April 18, 2022                                    Respectfully submitted,


                                                      s/Pamela C. Spees_____
                                                      PAMELA C. SPEES
                                                      La. Bar Roll No. 29679
                                                      Center for Constitutional Rights
                                                      666 Broadway, 7th Floor
                                                      New York, NY 10012
                                                      Tel and Fax: (212) 614-6431
                                                      pspees@ccrjustice.org

                                                      WILLIAM QUIGLEY
                                                      La. Bar Roll No. 7769
                                                      Professor of Law
                                                      Loyola University College of Law
                                                      7214 St. Charles Avenue
                                                      New Orleans, LA 70118
                                                      Tel. (504) 710-3074
                                                      Fax (504) 861-5440
                                                      quigley77@gmail.com

                                                      *Counsel for Plaintiffs*


CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2022, a copy of the foregoing was served on all counsel of record

via this court's electronic case filing system unless indicated otherwise.


                                                      s/Pamela C. Spees
                                                      Pamela C. Spees