**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

**ANNE WHITE HAT ET AL**　　　　　**CASE NO.  6:20-CV-00983**

**VERSUS**　　　　　　　　　　　　**JUDGE ROBERT R. SUMMERHAYS**

**JEFF LANDRY ET AL**　　　　　　**MAGISTRATE   JUDGE   CAROL   B.**
　　　　　　　　　　　　　　　　**WHITEHURST**


**MEMORANDUM RULING**

　　　Presently before the Court are the Plaintiffs' Motion for Summary Judgment [ECF No. 93]

and the Motion for Judgment on the Pleadings and Motion for Summary Judgment [ECF No. 94]

filed by defendant M. Bofill Duhé, District Attorney for the 16th Judicial District. Both motions

are opposed.

**I.**
**BACKGROUND**

**A.  Overview.**

　　　This case originated with the arrest of plaintiffs Anne White Hat, Ramon Mejía, and Karen

Savage ("White Hat Plaintiffs") during a 2018 protest in St. Martin Parish involving the Bayou

Bridge Pipeline. According to the White Hat Plaintiffs, the pipeline runs 162.5 miles from Lake

Charles to St. James and cuts through  many bodies of water, including the Atchafalaya Basin and

Bayou LaFourche, which is the source of drinking water for the surrounding communities.[1] The

construction of the Bayou Bridge Pipeline was controversial and attracted opposition from affected

communities, indigenous leaders, environmental activists, crawfish farmers, and landowners

---

[1] ECF No. 1 at ¶8.

voicing opposition.[2] Various state and federal lawsuits were filed opposing the construction of the pipeline.[3]

In the present case, the White Hat Plaintiffs were protesting on land in St. Martin Parish with the permission of Katherine and Peter Aalestad, Theda Larson Wright, Alberta Larson Stevens, and Judith Larson Hernandez, who owned fractional interests in the property (the "Landowner Plaintiffs"). According to the deputies called to the scene, they had received a statement from one of the co-owners of the property with a directive that no protesters were allowed to be on the property and authorizing the pipeline company to file a criminal trespass complaint on his behalf.[4]  According to the deputies who responded to the protest on August 18, 2018, plaintiffs Mejia and Savage were protesting underneath a "sky pod" suspended in a tree by a rope attached to the pipeline.[5] This caused the construction crew to shut down work on the pipeline to prevent inuries to the protestors and damage to the pipeline.[6] The September 3, 2018 protests that led to the arrest warrants for Plaintiffs White Hat and Savage, involved approximately 30–35 protesters who were allegedly climbing and jumping on the construction equipment, throwing mud into the exhaust and fuel tank of an excavator, throwing mud on the inside walls of a guard shack, and then locking the guard shack and removing the key.[7]

The protesters were ultimately instructed to leave the area around the pipeline—the boundary of which was marked by survey stakes. They did so only on the condition that the construction workers also leave. When the construction workers began operating their equipment again, the protesters re-entered the area and demanded that the workers leave. The deputies contend

---

[2] ECF No. 1 at ¶9.
[3] *Id.*
[4] ECF No. 93-4, p. 345, Plaintiffs' Ex. T, Stockstill "Authorization for Removal of Trespassers."
[5] ECF No. 93-4, pp. 346-355, Plaintiffs' Ex. U, V and W, Affidavits of Arrest by Deputy Gauthier and Deputy Bonvillain.
[6] *Id.*
[7] *Id.*

that they were outnumbered and instructed the workers to leave "to keep the peace," causing the work to be halted once again.[8] The White Hat Plaintiffs were arrested for "unauthorized entry of critical infrastructure" under La. R.S. 14:61 because they were allegedly protesting in close proximity to a pipeline (the Bayou Bridge Pipeline) allegedly protected by that statute. The White Hat Plaintiffs were ultimately released but were never formally charged, indicted, or otherwise prosecuted.

### B. The Louisiana Critical Infrastructure Statute.

The White Hat Plaintiffs mount a facial and "as applied" challenge to the constitutionality of La. R.S. 14:61. The parties fully briefed the history of this provision and its application to pipelines. In 2018, the Louisiana Mid-Continent Oil and Gas Association drafted and proposed an amendment to La. R.S. 14:61, which was enacted into law on August 1, 2018.[9] The statute prohibits the "unauthorized entry of a critical infrastructure" and defines an unauthorized entry as the following:

> (1) The intentional entry by a person without authority into any structure or onto any premises, belonging to another, that constitutes in whole or in part a critical infrastructure that is completely enclosed by any type of physical barrier.
>
> (2) The use or attempted use of fraudulent documents for identification purposes to enter a critical infrastructure.
>
> (3) Remaining upon or in the premises of a critical infrastructure after having been forbidden to do so, either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person.
>
> (4) The intentional entry into a restricted area of a critical infrastructure which is marked as a restricted or limited access area that is completely enclosed by any type of physical barrier when the person is not authorized to enter that restricted or limited access area. [10]

---

[8] *Id.*

[9] *Id.*

[10] ECF No. 1 at ¶54.

Prior to the amendment, the statute defined "critical infrastructure" to include "facilities like refineries, chemical manufacturing facilities, and water treatment plants which occupy visible and discrete land areas often completely enclosed by physical barriers and/or clearly demarcated by signs."[11] The 2018 amendments to the statute expanded this definition to include pipelines.[12] The statute further provides for criminal penalties for unauthorized entry: "Whoever commits the crime of unauthorized entry of a critical infrastructure shall be imprisoned with or without hard labor for not more than five years, fined not more than one thousand dollars, or both." Finally, the statute expressly excludes protected First Amendment activities from prosecution under the statute:

> Nothing in this Section shall be construed to apply to or prevent the following…
> [l]awful assembly and peaceful and orderly petition, picketing, or demonstration
> for the redress of grievances or to express ideas or views regarding legitimate
> matters of public interest, including but not limited to any labor dispute between
> any employer and its employee or position protected by the United States
> Constitution or the Constitution of Louisiana.

The White Hat Plaintiffs allege that La. R.S. 14:61 is unconstitutional on its face and as applied because: "1) it is vague as it does not provide adequate notice to plaintiffs and others, as well as state actors who must enforce the law, what conduct is prohibited and where, and allows for arbitrary and discriminatory enforcement; 2) it is overbroad and has the effect of chilling constitutionally protected speech or expression; and 3) targets speech and expressive conduct with a particular viewpoint for harsher punishment."[13]  They argue that the prior version of the statute

---

[11] ECF No. 1 at ¶3.
[12] La. R.S. 14:61 (defining "critical infrastructure"  to include "any and all structures, equipment, or other immovable or movable property located within or upon chemical manufacturing facilities, refineries, electrical power generating facilities, electrical transmission substations and distribution substations, water intake structures and water treatment facilities, natural gas transmission compressor stations, liquified natural gas (LNG) terminals and storage facilities, natural gas and hydrocarbon storage facilities, transportation facilities, such as ports, railroad switching yards, pipelines, and trucking terminals, or any site where the construction or improvement of any facility or structure referenced in this Section is occurring.") The statute defines pipelines as "flow, transmission, distribution, or gathering lines, regardless of size or length, which transmit or transport oil, gas, petrochemicals, minerals, or water in a solid, liquid, or gaseous state."
[13] ECF No. 1 at ¶2.

"gave notice to those who would enter such facilities without authorization, or remain after being forbidden, that they were on specially designated and protected property."[14] However, they argue that "critical infrastructure" now includes 125,000 miles of pipelines running through private and public spaces, and that the path of these protected pipelines are not visible or clearly marked.[15] The White Hat Plaintiffs contend that there is no notice identifying the area around a pipeline that is considered a part of the pipeline or "critical infrastructure."[16] The White Hat Plaintiffs also contend that the critical infrastructure statute provides no notice as to a private landowner's right to occupy and use the portions of his or her property through or under which a pipeline runs, and whether pipelines that run unmarked through public property or navigable waterways are subject to the statute.[17] They also argue that the critical infrastructure statute does not provide guidance to law enforcement officers on how or where to enforce the restrictions imposed by the statute and point out that the Amended Statute does not require that a trespasser have intent to do damage, cause harm, or otherwise commit an act of violence or criminal offense.[18]

## C.  Commencement of the Case.

This case was initially filed in the United States District Court for the Middle District of Louisiana by various plaintiffs against Louisiana Attorney General Jeff Landry, Sheriff Ronald Theriot and District Attorney M. Bofill Duhé. The action was brought pursuant to 42 U.S.C. §§ 1983 and 1988 alleging that the Amended Statute is facially unconstitutional and unconstitutional as applied.[19] Each of the three defendants filed motions to dismiss. On July 30, 2020, District Judge John deGravelles issued his Ruling and Order in which he dismissed claims against Attorney

---

[14] *Id.*
[15] ECF No. 1 at ¶¶4-5.
[16] ECF No. 1 at ¶58.
[17] ECF No. 1 at ¶¶60-62.
[18] ECF No. 1 at ¶¶56-57.
[19] ECF No. 1 at 1.

General Jeff Landry, granted the alternative relief sought by the other defendants to transfer venue to this court and denied the motions in all other respects.

The White Hat Plaintiffs requested reconsideration of the ruling dismissing the claims against Jeff Landry,[20] which the Court denied in a separate order. Defendants Duhé and Theriot re-urged their motions to dismiss on the basis that Judge deGravelles did not state any grounds for denying the motions in his Ruling and Order.  In addition to the three White Hat Plaintiffs, the original plaintiffs in this case included three environmental justice advocacy groups and two individuals affiliated with those groups: RISE St. James, 350 New Orleans, the Louisiana Bucket Brigade, Sharon Lavigne (the founder and president of RISE St. James),[21] and Harry Joseph (pastor of Mount Triumph Baptist Church and a member of RISE St. James).[22]  Finally, the case originally included the Landowner Plaintiffs. These plaintiffs are St. Martin Parish landowners who own undivided interests in property over which the Bayou Bridge Pipeline crosses.[23] This property was the site of the protests by the White Hat Plaintiffs and their arrest. On May 5, 2021, the Court entered a Memorandum Ruling on the re-urged motions to dismiss and dismissed the claims of all of the plaintiffs for lack of Article II standing with the exception of the White Hat Plaintiffs.

After the White Hat Plaintiffs filed their Motion for Summary Judgment, District Attorney Duhé indicated that he would not take a position on the constitutionality of La. R.S. 14:61. Accordingly, Louisiana Attorney Jeff Landry filed a motion seeking leave to intervene in the case for the limited purpose of addressing the constitutionality of the statute.[24]The Court granted the motion.[25]

---

[20] ECF No. 66.
[21] *Id.*
[22] ECF No. 1 at ¶26.
[23] ECF No. 1 at ¶23.
[24] ECF No. 102.
[25] ECF No. 118.

## II.
### SUMMARY JUDGMENT STANDARD.

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought."[26] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[27] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[28] As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[29]

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[30] "Credibility determinations are not part of the summary judgment analysis."[31] Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the

---

[26] Fed. R. Civ. P. 56(a).

[27] *Id.*

[28] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).

[29] *Lindsey v. Sears Roebuck and Co.,* 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).

[30] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (court must view all facts and evidence in the light most favorable to the non-moving party).

[31] *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).

existence of an element essential to that party's case, and on which that party will bear the burden of proof."[32]

The White Hat Plaintiffs seek summary judgment on their claims that (1) the Amended Statute violates the First Amendment; and (2) the Amended Statute violates the Due Process Clause because it is unconstitutionally vague and overbroad. Defendant Duhé, District Attorney for the 16th JDC, seeks summary judgment on the issue of standing, arguing that he has now firmly disavowed prosecution of the White Hat Plaintiffs and, as a result, they lack standing to pursue their First Amendment and Due Process Clause claims.

### III.
### STANDING

Duhe's Motion and the Attorney General's Opposition argue that the White Hat Plaintiffs lack Article III standing. Jurisdiction under Article III of the Constitution requires the presence of a "case or controversy" among the parties to a federal lawsuit.[33] Standing is one aspect of this case-or-controversy requirement.[34] Standing identifies "those disputes which are appropriately resolved through the judicial process,"[35] and "serves to prevent the judicial process from being used to usurp the powers of the political branches."[36] Courts have adopted various "prudential" standing doctrines but Article III standing requires at a minimum, that the plaintiff show (1) an "injury in fact," (2) a "causal connection between the injury and the conduct complained of," and (3) a showing that the injury will likely "be redressed by a favorable decision."[37] The injury-in-fact

---

[32] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

[33] U.S. Const. amend. III, § 2; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 136 S. Ct. 1540, 1549 (2016).

[34] *Spokeo, Inc.*, 136 S.Ct. at 1549 ("[T]he doctrine of standing derives from [Article III's] case-or-controversy requirement….")

[35] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[36] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

[37] *Lujan*, 504 U.S. at 560–561.

requirement ensures that the plaintiff has a "personal stake in the outcome of the controversy."[38] The plaintiff's injury must be "concrete, particularized, and actual or imminent …."[39] The causation element of standing requires that the plaintiff's injury be "fairly traceable to the defendant's allegedly unlawful conduct,"[40] while "redressability" requires a showing that the plaintiff's injury is likely to be redressed by the relief requested in the complaint.[41]

The Court previously rejected a challenge to the Article III standing of the White Hat Plaintiffs.[42] At that time, these plaintiffs had been arrested under La. R. S. 14:61, a charging decision had not been made, and the District Attorney had not disavowed prosecution. Citing the Fifth Circuit's decision in *Seals v. McBee*,[43] the Court ruled that the White Hat Plaintiffs had standing to pursue their claims because their arrest under La. R.S. 14:61 created a "credible threat of prosecution."[44] According to the *Seals* court, the plaintiff in that case was "not required to live under the specter of prosecution for violating a potentially unconstitutional law with nothing more than a non-committal promise as protection."[45] The Court also pointed to the White Hat Plaintiffs' assertions that the threat of future prosecution "chilled" their intent to engage in future protests at the Bayou Bridge Pipeline.[46] Constitutional violations may arise from the "chilling" effect of a statute or government regulation that falls "short of a direct prohibition over the exercise of First Amendment rights."[47] Accordingly, courts have held that "government actions that chill protected speech without prohibiting it" can satisfy the injury-in-fact requirement for Article III standing.[48]

---

[38] *Warth  v. Seldin*, 422 U.S. 490, 498 (1975) (internal quotation marks omitted).
[39] *Clapper*, 568 U.S. at 409 (quoting *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).
[40] *Allen v. Wright*, 468 U.S. 737, 751 (1984).
[41] *Id.*
[42] ECF No. 83.
[43] 898 F.3d 587 (5th Cir. 2018).
[44] ECF No. 83 at 11-12.
[45] *Seals*, 898 F.3d at 593.
[46] ECF No. 83 at 11.
[47] *Laird v. Tatum*, 408 U.S. 1 (1972).
[48] *Glass v. Paxton*, 900 F.3d 233, 238-40 (5th Cir. 2018).

In his new Motion to Dismiss and, in the alternative, Motion for Summary Judgment, Duhé points to new developments during the course of the case which, he contends, defeat standing.[49] Specifically, Duhé has filed an affidavit stating that, in a July 7, 2021 letter to the White Hat Plaintiffs' counsel, he "affirmatively disavowed any intent to prosecute White Hat, Mejia, and Savage (and others) for any alleged acts arising out the alleged events occurring from August 2018 through September 2018, which include the acts they have alleged to have taken on the date of their arrests."[50] Duhé further states in his affidavit that, in his letter, he "affirmatively disavow[ed] any *future* prosecution of White Hat, Mejia, Savage, or any of the individuals listed in [his] letter based on the events that allegedly took place in St. Martin Parish from August 2018 through September 2018 for which they were arrested."[51] In addition to Duhé's disavowal of prosecution, the statute of limitations with respect to the 2018 arrests lapsed in September 2022.[52]

These subsequent developments implicate the mootness doctrine, not standing. The Fifth Circuit has described "mootness" as "the doctrine of standing in a time frame."[53] In other words, a plaintiff must not only establish that he or she has standing under Article III at the commencement of the case, the plaintiff's personal stake that "exist[ed] at the commencement of the litigation (standing)" must "continue throughout [the case's] existence (mootness)."[54] Accordingly, even if a plaintiff has standing at the commencement of the case, the case may nevertheless become moot by events that occur during litigation and eliminate the plaintiff's personal interest in the case.[55] Here, Duhé argues that his disavowal of prosecution eliminates the

---

[49] Attorney General Landry joins in Duhé's standing arguments. ECF No. 119.
[50] ECF No. 94-3 at ¶¶ 6-7.
[51] *Id.* at ¶ 8 (emphasis added).
[52] La. C.Cr.P. art. 572(A)(2) provides for a time limitation of four years.
[53] *Centers for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)).
[54] *Id.*
[55] *Pool v. City of Houston*, 978 F.3d. 307, 313 (5th Cir. 2020).

plaintiff's personal stake in the case. The White Hat Plaintiffs counter that the District Attorney's disavowal of prosecution does not moot their claims because the disavowal is not legally binding and Duhé could reverse course.

Courts closely scrutinize mootness arguments that are based on a "voluntary cessation of a challenged activity."[56] A voluntary cessation of challenged conduct moots a First Amendment claim only if it is "absolutely clear that the allegedly wrongful behavior could not be reasonably expected to reoccur."[57] For example, in *Pool v. the City of Houston*, the City disavowed enforcement of a "zombie" city charter provision that allowed only registered voters to circulate petitions for initiatives and referenda.[58] The City argued that its post-suit disavowal of the provision mooted the plaintiff's constitutional challenge.[59] The Fifth Circuit disagreed, noting that the charter provision was not formally repealed and it was unclear whether the City's mere disavowal of enforcement was legally binding.[60] Similarly, in *Speech First, Inc. v. Fenves*, the court held that the University of Texas' post-suit amendments to a speech code did not moot the plaintiff's constitutional challenge to that code.[61] According to the court, the First Amendment challenge was not moot because, in part, the University had "not issued a controlling statement of future intention," and that there was nothing preventing the University from restoring the challenged provisions of the speech code.[62]

Duhé's disavowal of prosecution falls within this exception to the mootness doctrine. It is unclear from the record and the relevant authorities that the District Attorney's disavowal is legally binding and that it would prevent him from reversing course in the future. Indeed, Duhé's

---

[56] *Speech First, Inc. v. Fenves*, 979 F.3d. 319, 328 (5th Cir. 2020).
[57] *Id.*
[58] 978 F.3d. at 313-14.
[59] *Id.*
[60] *Id.*
[61] 979 F.3d. at 328.
[62] *Id.*

disavowal is limited to the protest and events that resulted in the 2018 arrest of the pipeline protestors, including the White Hat Plaintiffs. He does not disavow enforcement of La. R.S. 14:61 in connection with future protests of the Bayou Bridge Pipeline. On the other hand, the lapse of limitations is not a "voluntary cessation" of the enforcement of a challenged statute and moots any claims by the White Hat Plaintiffs based on their 2018 protest and arrest. It does not, however, moot their claims that La. R.S. 14:61 chills *future* pipeline protests.

The White Hat Plaintiffs argue that they continue to have a stake in this litigation based on the statute's "chilling" effect on future protests. Specifically, they wish to engage in future protests at the Bayou Bridge Pipeline as well as other pipeline projects and they fear that these protests might subject them to future prosecution under La. R.S. 14:61. "[C]hilling a plaintiff's speech . . . is a constitutional harm adequate to satisfy the injury-in-fact requirement."[63] To establish standing under this doctrine, a plaintiff must show (1) he or she intend to engage in constitutionally protected conduct that is arguably proscribed by the statute at issue, and (2) there is a "credible threat" of prosecution if the plaintiff engages in that constitutionally protected activity.[64]

The White Hat Plaintiffs satisfy both requirements: they intend to participate in future protests targeting the Bayou Bridge Pipeline and other pipeline projects and the record reflects a credible threat of prosecution given their arrest under that statute during the 2018 Bayou Bridge Pipeline protest. They also point to the prosecution of approximately fourteen other protestors under the same statute.[65] As discussed previously, while Duhé has disavowed prosecution of the White Hat Plaintiffs and others with connection with the 2018 protests, he has not disavowed the

---

[63] *Pool*, 978 F.3d. at 311.
[64] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (explaining that a plaintiff can establish standing if he or she "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exist a credible threat of prosecution thereunder").
[65] ECF No. 93-5, Declaration of William Quigley in Support of Plaintiffs' Motion for Summary Judgment, ¶ 3.

enforcement of La. R.S. 14:61 in connection with future protests involving the Bayou Bridge Pipeline. Accordingly, the Court re-affirms its prior ruling that the White Hat Plaintiffs possess Article III standing to the extent that enforcement of La. R.S. 14:61 chills their future protest activity. Duhé's Motion for Judgment on the Pleadings and, in the alternative, Motion for Summary Judgment is therefore DENIED.

## IV.
### FIRST AMENDMENT CLAIMS

#### A.  **First Amendment Facial Challenge.**

The First Amendment to the United States Constitution prohibits the government from making laws that abridge "the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The First Amendment is applicable to the states by virtue of the Fourteenth Amendment to the Constitution. The White Hat Plaintiffs mount a facial challenge to La. R.S. 14:61 on the grounds that it abridges freedom of speech and their right to peacefully protest in violation of the First Amendment. A facial challenge to a statute is "the most difficult challenge to mount successfully."[66] To successfully mount a facial challenge to a statute under the First Amendment on the grounds that the statute is overbroad, a plaintiff must show that the statute "prohibits a substantial amount of protected speech."[67] A facial challenge to the constitutionally of a statute presents a pure question of law.[68]

The White Hat Plaintiffs argue that La. R.S. 14:61 is presumptively unconstitutional because it includes content-based restrictions on the exercise of expressive conduct—such as protests and pickets—in violation of the First Amendment. They also argue that the statute is

---

[66] *United States v. Salerno*, 481 U.S. 739, 745 (1987).
[67] *United States v. Williams*, 553 U.S. 285, 292 (2008).
[68] *Carmouche*, 449 F.3d at 662.

unconstitutionally vague and overbroad. A law is unconstitutionally vague when it "(1) fails to apprise persons of ordinary intelligence of the prohibited conduct, or (2) encourages arbitrary and discriminatory enforcement."[69] Mere imprecision does not render a statute vague.[70] In fact, "[a] facial challenge for vagueness is appropriate only on an allegation that the law is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all."[71] A law is overbroad if it "encompasses a substantial number of unconstitutional applications 'judged in relation to the statute's plainly legitimate sweep.'"[72] The White Hat Plaintiffs argue that La. R.S. 14:61 does not provide adequate notice of the conduct it prohibits. The White Hat Plaintiffs assert that there are over 125,000 miles of oil and gas pipelines in Louisiana, many of which are underground and invisible, and often not clearly marked; they also cut through private and public land, water ways, wetlands, under public streets, sidewalks, parks, and other public spaces.[73]

### 1.  Does La. R.S. 14:61 Facially Prohibit a Substantial Amount of Protected Speech?

The Court's inquiry begins with the text of the relevant statute and whether that text regulates protected speech. La. R.S. 14:61 does not regulate speech in the traditional sense—i.e., written or spoken words—but addresses purely conduct. Specifically, it proscribes:

(1) Entering any structure or premises that qualifies as "critical infrastructure" that is "completely enclosed by any type of physical barrier;"

(2) Using "fraudulent documents for identification purposes" in order to gain entry to a critical infrastructure;

(3) Refusing to leave the premises that make up critical infrastructure "after been having forbidden to do so, either orally or in writing . . .;" and

---

[69] *City of Chicago v. Morales*, 527 U.S. 41, 90 (1999).
[70] *Ferguson v. Estelle*, 718 F.2d 730, 735 (5th Cir. 1983).
[71] *Id*. (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971)).
[72] *Seals*, 898 F.3d at 593 (5th Cir. 2018), as revised (Aug. 9, 2018) citing *United States v. Stevens,* 559 U.S. 460, 473 (2010).
[73] ECF No. 93-2, Statement of Material Facts ¶¶ 1-9.

(4) Intentionally entering, without authority, any restricted area of a critical infrastructure "which is marked as a restricted or limited access area that is completely enclosed by any type of physical barrier . . . ."[74]

This statutory provision is essentially a trespass statute that targets and provides enhanced protection for a specific type of real property—property containing "critical infrastructure" as defined in the statute. Like a traditional trespass statute, it proscribes intentional and unauthorized entry onto critical infrastructure covered the statute.

The fact that La. R.S. 14:61 targets conduct does not end the inquiry because conduct may be "sufficiently imbued with elements of communication to fall within the scope of the [First Amendment]."[75] So-called "symbolic expression" or "expressive conduct" includes conduct that delivers a message "that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative"[76] The classic example of symbolic speech or expressive conduct is peaceful picketing or demonstrations to protest some activity.[77] Here, the White Hat Plaintiffs contend that La. R.S. 14:61 sweeps in a substantial amount of protected speech in the form of picketing and demonstrations targeting pipeline projects. Turning to the text of the statute, the prohibitory language of La. R.S. 14:61(A)(1) through A(4) does not expressly regulate or restrict pickets, demonstrations, or other expressive activity. By restricting unauthorized entry, however, the statute may reach protected expressive conduct targeting pipelines or other critical infrastructure to the extent that these activities also involve the unauthorized entry onto protected critical infrastructure.

Putting aside the question of whether those protected activities could be subject to reasonable content-neutral regulation, La. R.S. 14:61 limits the effect of its restrictions on

---

[74] La. R.S. 14:61.
[75] *Spence v. State of Wash.*, 418 U.S. 405, 409-11 (1974).
[76] *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293-94 (1984).
[77] *Committee in Solidarity With People of El Salvador ("CISPES") v. F.B.I.*, 770 F.2d 468, 473 (1985).

protected speech in at least two ways. First, La. R.S. 14:61(D)(1) creates a "carve-out" for "picketing," "demonstration," and other forms of symbolic expression "protected by the United States Constitution or the Constitution of Louisiana."[78] While the Fifth Circuit has observed that a similar First Amendment carve-out could not save an otherwise invalid statute, such a carve-out can "validate a construction of the statute which avoids its application to protected expression."[79] This carve-out limits the impact of the statute on constitutionally protected speech. Second, two of the statute's four entry restrictions relate to conduct within critical infrastructure that is "completely enclosed by any type of physical barrier." As a result, these restrictions apply to conduct occurring in areas that limit public access and cannot be considered traditional public forums for free speech. As discussed further below, a party's First Amendment right to conduct pickets or protests is at its nadir on private property or within a non-forum. The third entry restriction does not require a physical barrier to trigger the restriction but applies only after a written or verbal warning to vacate a protected structure.[80] In sum, the text of La. R.S. 14:61 cuts against the White Hat Plaintiffs' argument that the statute proscribes a substantial amount of protected speech.[81]

### 2. Consideration of Forum.

Even if La. R.S. 14:61 sweeps in some protected speech, White Hat's First Amendment claim must be analyzed in the context of the forum where the statute's restrictions apply. "The scope of [a plaintiff's] First Amendment rights depends on the nature of the forum in which he

---

[78] La. R.S. 14:61(D)(1).

[79] *CISPES,* 770 F.2d at 474.

[80] The fourth restriction applies only to the use of a fraudulent entry document, which is inapplicable here. Even if it was, the First Amendment does not protect fraudulent conduct. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–41 (1974) ("Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues.")

[81] *Id.* at 473 ("[I]n order to invalidate a statute on overbreadth grounds, the overbreadth 'must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'").

seeks access."[82] The nature of forum impacts the level of scrutiny applied to restrictions on protected speech occurring within that forum. Courts have identified three types of forums: "the traditional public forum, the designated public forum, and the non-public forum."[83] A "non-public forum" is publicly-owned property that is not by tradition or government designation a forum for public communication.[84] A "public forum, on the other hand," are those places "which by long tradition or by government fiat have been devoted to assembly and debate."[85] A "designated public forum," is a forum the government designates as "a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects."[86] First Amendment protections are broadest with respect to protected speech occurring in a traditional public forum.[87] In a non-public forum, however, "an individual's First Amendment right to expression is at its nadir."[88] The White Hat Plaintiffs argue that the entry restrictions of La. R.S. 14:61 apply to a broad range of protected speech in public forums because of the ubiquity of pipeline networks throughout the state. The Court disagrees. The First Amendment carve-out discussed above excludes protected speech from the sweep of the statute. But, even in the absence of the carve-out, statute's restrictions would appear to be limited to expressive conduct occurring on private property or in *non-public* forums.

### a.  Private Property.

First, while not expressly limited to private property, the statute's entry restrictions appear framed to largely impact structures on private property. Two of the three relevant entry restrictions

---

[82]*Imani v. City of Baton Rouge*, No. 17-439, 2022 WL 2760799 at *17 (M.D. La. July 14, 2022) (quoting *Estiverne v. Louisiana State Bar Ass'n*, 863 F.2d 371, 376 (5th Cir. 1989)).

[83] *United Food & Commercial Workers Local 1099 ("United Food") v. City of Sidney*, 364 F.3d 738, 746 (6th Cir. 2004).

[84] *Id*.

[85] *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 44 (1983).

[86] *Cornelius v. NAACP Legal Defense & Education Fund, Inc*., 473 U.S. 788, 800 (1985).

[87] *Imani*, 2022 WL 2760799 at *17-18.

[88] *Caputo*, 201 F.Supp.3d 65, 70 (D.C. 2016).

refer to "structures" or "premises … belonging to another" and "completely enclosed by … [a] physical barrier." The third restriction prohibits "remaining" on the premises of critical infrastructure by any "owner, lessee, or custodian of the property or by any other authorized person." Moreover, many of the types of structures protected—pipelines, chemical manufacturing facilities, refineries, etc.—are traditionally private property. Indeed, the summary judgment record indicates that Bayou Bridge Pipeline is owned by a private entity and the pipeline protest in 2016 occurred on private property.[89] The White Hat Plaintiffs' First Amendment claims fail to the extent that La. R.S. 14:61 impacts speech on private property because there is no First Amendment right to trespass on private property to conduct protests or other forms of symbolic speech.[90] This reflects court decisions recognizing that the "right to exclude others is a fundamental element of private property ownership, and the First Amendment does not create an absolute right to trespass."[91] While the protections of the First Amendment may apply to private property that has been "devoted to a public use,"[92] the type of property affected by La. R.S. 14:61—critical infrastructure that, in most cases, is enclosed physical barriers—is typically not devoted to public use or otherwise open to the public for protected First Amendment activities.

The White Hat Plaintiffs counter that they had the permission of the Landowner Plaintiffs to enter the property where the Bayou Bridge Pipeline protest occurred. However, if true, it is

---

[89] ECF No. 93-7, Declaration of Peter Aaslestad.

[90] *Id.*; see also *Lloyd Corp., Limited v. Tanner*, 407 U.S. 551, 567 (1972). In *Tanner* the Supreme Court observed:

> Although accommodations between the values protected by [the First, Fourteenth and Fifth] Amendments are sometimes necessary, and the courts properly have shown a special solicitude for the guarantees of the First Amendment, this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatory for private purposes only . . . .
> *Id.*

[91] *See, e.g., Armes v. City of Philadelphia*, 706 F. Supp. 1156, 1164-66 (E.D. Pa. 1989).

[92] *Cornelius*, 473 U.S. at 801 (1985) ("[A] speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns.").

unclear that permission to enter the property changes the result as far as the First Amendment. The nature of the forum remains the same: it is private property and the Bayou Bridge Pipeline is owned by a private entity.[93] Private property does not "lose its private character merely because the public is generally invited to use it for designated purposes."[94] Moreover, the Landowner Plaintiffs are not the sole owners of the property.[95] As the Attorney General points out in his opposition, another co-owner of the same property, Dominic Giampula, authorized Bayou Bridge Pipeline, LLC to exercise his right to exclude the protesters from his property and, if required, "contact law enforcement on my behalf in the event that I am unavailable and a trespass occurs."[96] The Attorney General argues that, under Louisiana law, as "against third persons, a co-owner has the right to use and enjoy the thing as if he were the sole owner," including the right to exclude third-party trespassers.[97] The Court agrees. The First Amendment does not eliminate Giampula's right, as an owner of private land, to exclude the White Hat Plaintiffs and other protestors from his property.[98]

### b.  Non-Public Forum.

The statute's definition of critical infrastructure also includes structures that arguably could be owned and operated by government actors—for example, "electrical power generating facilities," "electrical transmission substations," "water intake structures and water treatment facilities," and "ports."  However, even if La. R.S. 14:61 impacts speech or expressive conduct on public property, "the First Amendment does not guarantee access to property simply because it is

---

[93] ECF No. 93-4 at 345 (identifying Bayou Bridge Pipeline, LLC as the owner).
[94] *Tanner*, 407 U.S. at 570.
[95] The Landowner Plaintiffs held fractional interests in the property where the protest occurred of 0.0005803, 0.0005803, and 0.0000994, respectively.
[96] ECF No. 93-4 at 345.
[97] La. C.C. Art. 802. The Attorney General also cites the commentary to that civil code article, which states that "a co-owner, may *alone* take all the necessary steps for preservation of the property, including the institution of suits against trespassers or usurpers." ECF No. 119 at 19 (emphasis added).
[98] *Armes*, 706 F. Supp. at 1164-66.

owned or controlled by the government."[99] "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."[100] Access to a nonpublic forum can be regulated "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."[101] In *Greer v. Spock*, for example, the defendants challenged a regulation banning "speeches and demonstrations of a partisan political nature" and prohibiting "the distribution of literature without prior approval" at Fort Dix.[102] The Supreme Court examined the purpose of federal military reservations such as Fort Dix—"to train soldiers, not to provide a public forum"—as well as the "the historically unquestioned power of its commanding officer summarily to exclude civilians from the area of his command."[103] The Supreme Court observed that use of the military reservation as a traditional public forum for speech and expressive conduct would run counter to the use to which Fort Dix was dedicated: "the notion that federal military reservations, like municipal streets and parks, have traditionally served as a place for free public assembly and communication of thoughts by private citizens is … historically and constitutionally false."[104] The Court concluded that Fort Dix was not a public forum, and that the challenged regulation was viewpoint neutral and reasonable in light of the purpose for the military reservation.

Here, La. R.S. 14:61 targets and protects structures that, like the military reservations at issue in *Greer*, serve very specific and important purposes unrelated to public speech—the provision of water, electricity, transportation, and energy production. The statute is also limited to facilities enclosed by a physical barrier,[105] or premises where the public has been expressly

---

[99] *United States Postal Service v. Council of Greenburgh Civic Ass'n*, 453 U.S. 114, 129 (1981).
[100] *Greer v. Spock*, 424 U.S. 828, 836 (1976).
[101] *Cornelius*, 473 U.S. at 49.
[102] 424 U.S. at 830.
[103] *Id.* at 838.
[104] *Id.*
[105] La. R.S. 14:61(A)(1) and (4).

forbidden to enter or remain on the property.[106] There is no evidence in the summary judgment record that the statute applies to facilities that have been designated as public forums or that they have been opened to the public as limited public forums. Accordingly, applying *Greer*, the statute does not violate the First Amendment if its restrictions are reasonable and viewpoint neutral. The statute's restrictions appear reasonable in light of the purpose of the statute—the protection of critical infrastructure facilities. Two of restrictions are limited to facilities surrounded by a physical barrier and do not, on their face, apply to expressive conduct beyond those barriers. The statute's other entry restriction applies only after a verbal or written warning. Moreover, as explained above, the statute contains a carve-out excluding expressive conduct protected by the First Amendment. The statute's entry restrictions also do not discriminate on the basis of the viewpoint of any expressive conduct they may impact—they apply across the board. While the White Hat Plaintiffs argue that the First Amendment carve-out introduces a content-based restriction, as discussed further below, that carve-out is not content based when viewed in its entirety.

In sum, a First Amendment forum analysis further cuts against the White Hat Plaintiffs' facial challenge to La. R.S. 14:61.

### 3. Content-Based Restrictions Versus Content-Neutral Restrictions on Speech.

Even if La. R.S. 14:61 incidentally sweeps in some protected expressive conduct occurring in a public forum, that does not, standing alone, render the statute facially unconstitutional. The level of scrutiny applied to a restriction on speech in a public forum "turns on whether the restriction is content-based or content-neutral."[107] Content-based regulations are presumptively invalid under the First Amendment and courts apply a "strict scrutiny" standard to those

---

[106] La. R.S. 14:61(A)(3).
[107] *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228-30 (1987).

regulations.[108] In contrast, content-neutral regulations of symbolic speech receive a lesser degree of scrutiny under the test set forth in *United States v. O'Brien*.[109] A speech restriction "is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed."[110] This inquiry "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."[111] In *Reed v. Town of Gilbert, Arizona*, the Supreme Court explained that some content-based distinctions are "obvious" insofar as they define speech "by particular subject matter," whereas others "are more subtle, defining regulated speech by its function or purpose."[112] However, "[b]oth are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny."[113] According to the Court in *Reed*, a separate category of laws may be facially neutral, but still content based, if they cannot be "justified without reference to the content of the regulated speech" or if they were "adopted by the government 'because of disagreement with the message [the speech] conveys.'"[114] Applying this analysis in *Reed*, the Court found that a town's sign ordinance was content based on its face because it exempted from certain permitting requirements three categories of signs, namely ideological signs, political signs, and temporary-event signs, which were exempted based only on the contents of the messages they expressed.[115]

Unlike the ordinance at issue in *Reed*, La. R.S. 14:61 does not, "on its face," restrict symbolic speech based on the idea or message expressed based on that speech. Instead, it proscribes entry onto premises containing critical infrastructure without reference to the purpose

---

[108] *Perry*, 460 U.S. at 45.
[109] 391 U.S. 367 (1968).
[110] *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155, 163 (2015).
[111] *Id*.
[112] *Id*. at 163, 135 S. Ct. 2218.
[113] *Id*.
[114] *Id*. (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).
[115] *Id*. at 164–65, 135 S.Ct. 2218.

of that entry or the ideas or message advanced by those who enter the premises.[116] Plaintiffs argue that the statute is content based in two respects. First, they point to the "carve-out" provision in section 14:61(D)(1) and argue that the provision's reference to "ideas or views regarding legitimate matters of public interest" is a content-based restriction in that it discriminates based on whether the symbolic speech at issue involves matters of public interest. They contend that this language provides government decision makers overly broad discretion in determining which speech involves legitimate matters of public interest. The Court disagrees. The White Hat Plaintiffs focus on isolated language in section 14:61(D)(1) without reading that language in the context of the entire provision. Specifically, the carve-out provision ultimately ends with a broad "catch all" clause excluding any "position protected by the United States Constitution or the Constitution of Louisiana" from the sweep of La. R.S. 14:61. A fair reading of section 14:61(D)(1) in its entirety is that the carve-out extends to any protest, demonstration, picket, or other expressive conduct protected by the First Amendment without regard to the content of the message conveyed. Accordingly, the text of section 14:61(D)(1) does not render the statute a content-based restriction on protected speech.

The White Hat Plaintiffs next argue that La. R.S. 14:61 is content-based because the legislative history of the statute shows that it was promoted by the Louisiana Mid-Continental Oil and Gas Association to squelch protests against pipeline projects.[117] They allege that the 2018 amendment to the statute adding pipelines to the definition of "critical infrastructure" occurred "at a time when environmental activists' challenges to the danger of pipeline activity were on the

---

[116] La. R.S. 14:61(A)(2) does refer to the "use of fraudulent documents for identification purposes." Fraudulent statements, however, are not protected speech under the First Amendment. *See McIntyre v. Ohio Elections Com'n*, 514 U.S. 334-357 (1995).
[117] ECF No. 96-1 at 9.

rise."[118] The White Hat Plaintiffs contend that the 2018 pipeline amendment to the statute "was initiated by leaders of the oil and gas industry who have obviously vested and financial interest in skewing the debate about the dangers of continued pipeline expansion."[119] In this regard, they point to evidence that the 2018 amendment to La. R.S. 14:61 was drafted by the general counsel of the Louisiana Mid-Continental Oil and Gas Association.

This resort to legislative history does not convert an otherwise facially-neutral statute into a content-based restriction on symbolic speech. The Supreme Court has held that a statute is not rendered a content-based restriction on free speech merely because statute's "enactment was motivated by the conduct of the partisans on one side of a debate."[120] More importantly, the legislative history cited by the White Hat Plaintiffs actually refutes their argument that the 2018 pipeline amendment to La. R.S. 14:61 was intended to squelch pipeline protests and environmental activists' opposition to pipeline projects like the Bayou Bridge Pipeline. Specifically, the White Hat Plaintiffs quote the lead sponsor of the 2018 amendment explaining that the statute "does nothing to impact the ability to peacefully protest … [but] only comes into play when there is damage to that critical infrastructure, so if you don't damage anything, this law does not apply."[121] Damage caused to critical infrastructure does not fall within the protections of the First Amendment given that courts have repeatedly held that the First Amendment protects only "peaceful" picketing and protest activities.[122] Moreover, the statute's carve-out for protected First Amendment speech "is a valuable indication of [legislative] concern with the preservation with

---

[118] *Id*. at 13.
[119] *Id*.
[120] *Hill v. Colorado*, 530 U.S. 703, 724 (2000).
[121] ECF No. 96-1 at 10.
[122] *United States v. Grace*, 461 U.S. 171, 176 (1983) ("there is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving speech protected by the First Amendment.").

First Amendment rights in the specific context of the statute in question."[123] In sum, to the extent that it restricts protected speech, La. R.S. 14:61 is content-neutral.

### 4. The *O'Brien* Test.

The Supreme Court's *O'Brien* test is the proper "analytical framework to evaluate content-neutral restrictions on expressive activities."[124] Under *O'Brien,* a content-neutral restriction on expressive conduct survives constitutional scrutiny if (1) it is within the constitutional power of the government, (2) it furthers an important or substantial government interest, (3) the interest is unrelated to the suppression of expression, and (4) the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest.[125]

With respect to the first *O'Brien* factor, the parties do not appear to challenge the state's constitutional power to enact a statute protecting critical infrastructure located within its borders. Nor do they challenge the constitutionality of state enactments proscribing trespass on private property in general. La. R.S. 14:61 appears to fall squarely within the police powers of the state—"the protection of the lives, health, and property of [Louisiana] citizens, maintenance of good order, and the preservation of the public good."[126] The Attorney General also persuasively argues that protection of critical infrastructure in the state furthers an important or substantial government interest, and that the protection of this property from damage caused by unauthorized entry is unrelated to the suppression of expressive conduct, such as protests and picketing. The carve-out for protests and other expressive conduct protected by the First Amendment in section 14:61(D)(1) confirms that the purpose of the statute is the protection of critical infrastructure, not the suppression of protected speech. Finally, any incidental restrictions on First Amendment activities

---

[123] *CISPES*, 770 F.2d at 474.
[124] *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282-83 (5ᵗʰ Cir. 2001).
[125] *O'Brien*, 391 U.S. at 377.
[126] *Mugler v. Kansas*, 123 U.S. 623 (1887).

resulting from La. R.S. 14:61 is no more than necessary to facilitate the state's interest in protecting critical infrastructure in light of (1) the First Amendment carve-out in section 14:61(D)(1), and (2) the fact that the statute targets unprotected conduct—unauthorized entry onto property containing protected critical infrastructure.

* * *

In sum, La. R.S. 14:61 does not, on its face, restrict speech but expressly excludes protected First Amendment expressive conduct from the reach of the statute's prohibitions. Even if the statute incidentally reaches some protected conduct, it is not content-based and satisfies the Supreme Court's *O'Brien* test. Accordingly, the White Hat Plaintiffs' facial challenge to La. R.S. 14:61 fails, and their Motion for Summary Judgment is therefore DENIED as to their facial challenge to the statute.

### B.    First Amendment "As Applied" Challenge.

The White Hat Plaintiffs also mount an "as applied" challenge to La. R.S. 14:61. In other words, they argue that the statute is unconstitutional as applied to their protests against the Bayou Bridge Pipeline even if the statute is facially valid. As explained in the Court's discussion on standing, any "as applied" claims that are grounded on the White Hat Plaintiffs' protest activities and subsequent arrest in August and September of 2018 are now moot given the lapse of the statute of limitations. On the other hand, to the extent that they seek a declaration that the statute is unconstitutional as applied to a future anticipated protests of the Bayou Bridge Pipeline on private property, the White Hat Plaintiffs lack a constitutionally protected right to protest on private property. Even if the White Hat Plaintiffs intend to challenge the application of La. R.S. 14:61 to protest activities on public property, courts generally apply the *O'Brien* framework for "as

applied" challenges to content-neutral speech regulations.[127] As explained above, the statute is content neutral and satisfies all four of the *O'Brien* requirements. Accordingly, plaintiffs cannot maintain an "as applied" challenge to La. R.S. 14:61 based on the summary judgment record and relevant authorities. Plaintiffs' Motion for Summary Judgment is, therefore, DENIED with respect to their "as applied" challenge to the statute.

## V.
### DUE PROCESS CHALLENGE

Finally, the White Hat Plaintiffs contend that L.A. R.S. 14:61 is unconstitutionally vague and, therefore, violates the Due Process Clause of the Fourteenth Amendment. A criminal statute is unconstitutionally vague if it is written so imprecisely "that it fails to give ordinary people fair notice of the conduct it prohibits," or is "so standardless that it invites arbitrary enforcement."[128] LA. R.S. 14:61 is not unconstitutionally vague under either standard. Three of the statute's entry restrictions provide clear notice to any ordinary person of the conduct that is prohibited. Section 14:61(A)(1) prohibits entry into the premises of critical infrastructure that is "enclosed by any type of physical barrier." Section 14:61(A)(4) restricts access to restricted or limited access areas of critical infrastructure that is similarly "enclosed by any type of physical barrier" and "marked as a restricted or limited access area." While the restriction in Section 14:61(A)(3) is not limited to areas surrounded by a physical barrier, it proscribes conduct only *after* an "authorized person" instructs the trespasser to leave the premises orally or in writing. The Court concludes that the operative language of Section 14:61 provides any ordinary person with sufficient notice of the conduct it proscribes and that it provides specific standards sufficient to prevent arbitrary

---

[127] *Caputo*, 201 F.Supp.3d at 71.
[128] *Johnson v. United States*, 576 U.S. 591 (2015).

enforcement.[129] In sum, the summary judgment record does not support plaintiff's vagueness challenge under the Due Process clause. The White Hat Plaintiffs' Motion for Summary is, therefore, DENIED with respect to their Due Process claim.

## VI.
### RULE 56(F)

None of the defendants filed a Rule 56 motion for summary judgment on the merits of the White Hat Plaintiffs' claims. However, the Court's resolution of the White Hat Plaintiffs' Motion for Summary Judgment resolves a number of questions of law suitable for resolution on summary judgment. Specifically, based on the text of the statute, the governing law, and the summary judgment record, it does not appear that the White Hat Plaintiffs can maintain a facial or "as applied" challenge to La. R.S. 14:61 under the First Amendment. Nor does the record support their vagueness challenge under the Due Process Clause. Under Rule 56(f) of the Federal Rules of Civil Procedure, the Court may "grant summary judgment for a non-movant" after providing the opposing party notice and reasonable time to respond. Accordingly, the Court, hereby provides the White Hat Plaintiffs with notice under Rule 56(f) that, for the reasons discussed above, the Court intends to grant summary judgment in favor of the defendants on the First Amendment and Due Process claims asserted in the complaint. Pursuant to Rule 56(f), the plaintiffs have thirty (30) days from the date of this ruling to file a response as to why summary judgment should not be granted in favor of the defendants. The defendants will then have fourteen (14) days to respond to the White Hat Plaintiffs' filing.

---

[129] *See, e.g., Caputo*, 201 F.Supp.3d at 72 (concluding that restriction against unauthorized entry onto the grounds of the White House was not unconstitutionally vague because the "White House's perimeter, demarcated by an imposing fence and manned by scores of Secret Service agents, unambiguously provides ordinary people with fair notice that unauthorized entry onto the grounds is unlawful.").

**VII.**
**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment [ECF No. 93] and the Motion for Judgment on the Pleadings and Motion for Summary Judgment [ECF No. 94] filed by defendant M. Bofill Duhé are DENIED. However, pursuant to Rule 56(f), the plaintiffs have thirty (30) days from the date of this ruling to file a response as to why summary judgment should not be granted in favor of the defendants. The defendants will then have fourteen (14) days to respond to the White Hat Plaintiffs' filing.

THUS DONE in Chambers on this 5th day of June, 2023.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE