## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

ANNE WHITE HAT ET AL          CASE NO.  6:20-CV-00983

VERSUS                      JUDGE ROBERT R. SUMMERHAYS

JEFF LANDRY ET AL             MAGISTRATE JUDGE CAROL B. WHITEHURST

### CORRECTED MEMORANDUM RULING

The present matter before the Court is the Plaintiffs' Response to the Court's Notice Pursuant to Fed. R. Civ. P. 56(f) and Motion to Reconsider (the "Rule 56(f) Response") [ECF No. 129]. The Court had previously denied Plaintiffs' Motion for Summary Judgment [ECF No. 93] and the Motion for Judgment on the Pleadings and Motion for Summary Judgment [ECF No. 94] filed by defendant M. Bofill Duhé, District Attorney for the 16th Judicial District. [ECF No. 127]. However, the state intervenor, former Attorney General Jeff Landry, and defendants M. Bofill Duhé and Becket Breaux did not file motions for summary judgment addressing the merits of Plaintiffs' claims—Duhé's motion was based on Article III standing. In its ruling on the motions for summary judgment, the Court issued a notice under Rule 56(f) of the Federal Rules of Civil Procedure placing Plaintiffs on notice that the Court intended to grant summary judgment in favor of the Defendants and providing Plaintiffs with an opportunity to respond. As explained herein, the Court DENIES Plaintiffs' Motion to Reconsider and GRANTS summary judgment DISMISSING Plaintiffs' claims under Rule 56(a) and 56(f).

1

# I.
## BACKGROUND

### A.  Overview.

This case originated with the arrest of plaintiffs Anne White Hat, Ramon Mejía, and Karen Savage during a 2018 protest in St. Martin Parish involving the Bayou Bridge Pipeline. According to the Plaintiffs, the pipeline runs 162.5 miles from Lake Charles to St. James and cuts through many bodies of water, including the Atchafalaya Basin and Bayou LaFourche, which is the source of drinking water for the surrounding communities.[1] The construction of the Bayou Bridge Pipeline was controversial and attracted opposition from affected communities, indigenous leaders, environmental activists, crawfish farmers, and landowners voicing opposition.[2] Various state and federal lawsuits were filed opposing the construction of the pipeline.[3]

The Plaintiffs were protesting on land in St. Martin Parish with the permission of Katherine and Peter Aalestad, Theda Larson Wright, Alberta Larson Stevens, and Judith Larson Hernandez, who owned fractional interests in the property. According to the deputies called to the scene, they had received a statement from one of the co-owners of the property with a directive that no protesters were allowed to be on the property and authorizing the pipeline company to file a criminal trespass complaint on his behalf.[4]  According to the deputies who responded to the protest on August 18, 2018, plaintiffs Mejia and Savage were protesting underneath a "sky pod" suspended in a tree by a rope attached to the pipeline.[5] This caused the construction crew to shut down work on the pipeline to prevent injuries to the protestors and damage to the pipeline.[6] The

---

[1] ECF No. 1 at ¶8.
[2] ECF No. 1 at ¶9.
[3] *Id.*
[4] ECF No. 93-4, p. 345, Plaintiffs' Ex. T, Stockstill "Authorization for Removal of Trespassers."
[5] ECF No. 93-4, pp. 346-355, Plaintiffs' Ex. U, V and W, Affidavits of Arrest by Deputy Gauthier and Deputy Bonvillain.
[6] *Id.*

September 3, 2018 protests that led to the arrest warrants for Plaintiffs White Hat and Savage, involved approximately 30–35 protesters who were allegedly climbing and jumping on the construction equipment, throwing mud into the exhaust and fuel tank of an excavator, throwing mud on the inside walls of a guard shack, and then locking the guard shack and removing the key.[7]

The protesters were ultimately instructed to leave the area around the pipeline—the boundary of which was marked by survey stakes. They did so only on the condition that the construction workers also leave. When the construction workers began operating their equipment again, the protesters re-entered the area and demanded that the workers leave. The deputies contend that they were outnumbered and instructed the workers to leave "to keep the peace," causing the work to be halted once again.[8] The Plaintiffs were arrested for "unauthorized entry of critical infrastructure" under La. R.S. 14:61 because they were allegedly protesting in close proximity to a pipeline. The Plaintiffs were ultimately released but were never formally charged, indicted, or otherwise prosecuted.

**B.  The Louisiana Critical Infrastructure Statute.**

The Plaintiffs mount a facial and "as applied" challenge to the constitutionality of La. R.S. 14:61. The parties fully briefed the history of this provision and its application to pipelines. In 2018, the Louisiana Mid-Continent Oil and Gas Association drafted and proposed an amendment to La. R.S. 14:61, which was enacted into law on August 1, 2018.[9] The statute prohibits the "unauthorized entry of a critical infrastructure" and defines an unauthorized entry as the following:

> (1) The intentional entry by a person without authority into any structure or onto any premises, belonging to another, that constitutes in whole or in part a critical infrastructure that is completely enclosed by any type of physical barrier.

---

[7] *Id.*
[8] *Id.*
[9] *Id.*

3

(2) The use or attempted use of fraudulent documents for identification purposes to enter a critical infrastructure.

(3) Remaining upon or in the premises of a critical infrastructure after having been forbidden to do so, either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person.

(4) The intentional entry into a restricted area of a critical infrastructure which is marked as a restricted or limited access area that is completely enclosed by any type of physical barrier when the person is not authorized to enter that restricted or limited access area. [10]

Prior to the amendment, the statute defined "critical infrastructure" to include "facilities like refineries, chemical manufacturing facilities, and water treatment plants which occupy visible and discrete land areas often completely enclosed by physical barriers and/or clearly demarcated by signs."[11] The 2018 amendments to the statute expanded this definition to include pipelines.[12] The statute further provides for criminal penalties for unauthorized entry: "Whoever commits the crime of unauthorized entry of a critical infrastructure shall be imprisoned with or without hard labor for not more than five years, fined not more than one thousand dollars, or both." Finally, the statute expressly excludes protected First Amendment activities from prosecution under the statute.[13]

The Plaintiffs allege that La. R.S. 14:61 is unconstitutional on its face and as applied because: "1) it is vague as it does not provide adequate notice to plaintiffs and others, as well as state actors who must enforce the law, what conduct is prohibited and where, and allows for

---

[10] ECF No. 1 at ¶54.

[11] ECF No. 1 at ¶3.

[12] La. R.S. 14:61 (defining "critical infrastructure"  to include "any and all structures, equipment, or other immovable or movable property located within or upon chemical manufacturing facilities, refineries, electrical power generating facilities, electrical transmission substations and distribution substations, water intake structures and water treatment facilities, natural gas transmission compressor stations, liquified natural gas (LNG) terminals and storage facilities, natural gas and hydrocarbon storage facilities, transportation facilities, such as ports, railroad switching yards, pipelines, and trucking terminals, or any site where the construction or improvement of any facility or structure referenced in this Section is occurring.") The statute defines pipelines as "flow, transmission, distribution, or gathering lines, regardless of size or length, which transmit or transport oil, gas, petrochemicals, minerals, or water in a solid, liquid, or gaseous state."

[13] La. R.S. 14:61(D)(1) and discussion below.

arbitrary and discriminatory enforcement; 2) it is overbroad and has the effect of chilling constitutionally protected speech or expression; and 3) targets speech and expressive conduct with a particular viewpoint for harsher punishment."[14]  They argue that the prior version of the statute "gave notice to those who would enter such facilities without authorization, or remain after being forbidden, that they were on specially designated and protected property."[15] However, they argue that "critical infrastructure" now includes 125,000 miles of pipelines running through private and public spaces, and that the path of these protected pipelines are not visible or clearly marked.[16] The Plaintiffs contend that there is no notice identifying the area around a pipeline that is considered a part of the pipeline or "critical infrastructure."[17] The Plaintiffs also contend that the critical infrastructure statute provides no notice as to a private landowner's right to occupy and use the portions of his or her property through or under which a pipeline runs, and whether pipelines that run unmarked through public property or navigable waterways are subject to the statute.[18] They also argue that the critical infrastructure statute does not provide guidance to law enforcement officers on how or where to enforce the restrictions imposed by the statute and point out that the statute does not require that a trespasser have intent to do damage, cause harm, or otherwise commit an act of violence or criminal offense.[19]

### C.  Commencement of the Case.

This case was initially filed in the United States District Court for the Middle District of Louisiana by various plaintiffs against Louisiana Attorney General Jeff Landry, Sheriff Ronald Theriot and District Attorney M. Bofill Duhé. The action was brought pursuant to 42 U.S.C. §§

---

[14] ECF No. 1 at ¶2.
[15] *Id.*
[16] ECF No. 1 at ¶¶4-5.
[17] ECF No. 1 at ¶58.
[18] ECF No. 1 at ¶¶60-62.
[19] ECF No. 1 at ¶¶56-57.

1983 and 1988 alleging that La. R.S. 14:61 is facially unconstitutional and unconstitutional as applied.[20] Each of the three defendants filed motions to dismiss. On July 30, 2020, District Judge John deGravelles issued his Ruling and Order in which he dismissed claims against Attorney General Jeff Landry, granted the alternative relief sought by the other defendants to transfer venue to this court, and denied the motions in all other respects.

The Plaintiffs requested reconsideration of the ruling dismissing the claims against Jeff Landry,[21] which the Court denied in a separate order. Defendants Duhé and Theriot re-urged their motions to dismiss on the basis that Judge deGravelles did not state any grounds for denying the motions in his Ruling and Order.  In addition to the three Plaintiffs, the original plaintiffs in this case included three environmental justice advocacy groups and two individuals affiliated with those groups: RISE St. James, 350 New Orleans, the Louisiana Bucket Brigade, Sharon Lavigne (the founder and president of RISE St. James),[22] and Harry Joseph (pastor of Mount Triumph Baptist Church and a member of RISE St. James).[23]  Finally, the case originally included the Landowner Plaintiffs. These plaintiffs are St. Martin Parish landowners who own undivided interests in property over which the Bayou Bridge Pipeline crosses.[24] This property was the site of the protests by the Plaintiffs and their arrest. On May 5, 2021, the Court entered a Memorandum Ruling on the re-urged motions to dismiss and dismissed the claims of all of the plaintiffs with the exception of the Plaintiffs.

Plaintiffs then filed their Motion for Summary Judgment, arguing that, as a matter of law, (1) La. R.S. 14:61 violates the First Amendment on its face or, alternatively, as applied; and (2)

---

[20] ECF No. 1 at 1.
[21] ECF No. 66.
[22] *Id.*
[23] ECF No. 1 at ¶26.
[24] ECF No. 1 at ¶23.

the statute violates the Due Process Clause because it is unconstitutionally vague and overbroad. Defendant Duhé, District Attorney for the 16th JDC, sought summary judgment on the issue of standing, arguing that he has now firmly disavowed prosecution of the Plaintiffs and, as a result, they lack standing to pursue their First Amendment and Due Process Clause claims. However, Duhé indicated that he would not take a position on the constitutionality of La. R.S. 14:61. Accordingly, Louisiana Attorney General Jeff Landry filed a motion seeking leave to intervene in the case for the limited purpose of addressing the constitutionality of the statute.[25] The Court granted the motion.[26] AG Landry did not file a motion for summary judgment but opposed Plaintiffs' Motion and argued that the court could grant summary judgment under Rule 56. The Court ultimately denied Plaintiff's Motion and  Duhé's Motion but notified Plaintiffs of its intent to enter summary judgment under Rules 56(a) and 56(f). The Court then provided Plaintiffs with time to file their Rule 56(f) Response. AG Landry filed a response urging dismissal of Plaintiffs' claims on the merits.

## II.
### SUMMARY JUDGMENT STANDARD.

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought."[27] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[28] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[29] As summarized by the Fifth Circuit:

---

[25] ECF No. 102.
[26] ECF No. 118.
[27] Fed. R. Civ. P. 56(a).
[28] *Id.*
[29] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[30]

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[31] "Credibility determinations are not part of the summary judgment analysis."[32] Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof."[33] Under Rule 56(f), a court may "[a]fter giving notice and a reasonable time to respond… (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."

### III.
### FIRST AMENDMENT CLAIMS

#### A.  **Plaintiffs' Facial Challenge Under The First Amendment**.

The First Amendment to the United States Constitution prohibits the government from making laws that abridge "the freedom of speech, or of the press; or the right of the people

---

[30] *Lindsey v. Sears Roebuck and Co.,* 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).

[31] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (court must view all facts and evidence in the light most favorable to the non-moving party).

[32] *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).

[33] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

peaceably to assemble, and to petition the Government for a redress of grievances." The First Amendment is applicable to the states by virtue of the Fourteenth Amendment to the Constitution. The Plaintiffs mount a facial challenge to La. R.S. 14:61 on the grounds that it abridges freedom of speech and their right to peacefully protest in violation of the First Amendment. A facial challenge to a statute is "the most difficult challenge to mount successfully."[34] To successfully mount a facial challenge to a statute under the First Amendment on the grounds that the statute is overbroad, a plaintiff must show that the statute "prohibits a substantial amount of protected speech."[35] A facial challenge to the constitutionally of a statute presents a pure question of law.[36]

Plaintiffs contend that La. R.S. 14:61 is presumptively unconstitutional because it includes content-based restrictions on the exercise of expressive conduct—such as protests and picketing—in violation of the First Amendment. They further argue that, even if the statute does not discriminate on the basis of content, the statute is overbroad. A law is overbroad if it "encompasses a substantial number of unconstitutional applications 'judged in relation to the statute's plainly legitimate sweep.'"[37] Here, Plaintiffs assert that there are over 125,000 miles of oil and gas pipelines in Louisiana that cut through private and public land, water ways, wetlands, under public streets, sidewalks, parks, and other public spaces.[38] They also point out that many of these pipelines are underground and invisible and thus not clearly marked to warn potential protesters that they may be trespassing on critical infrastructure. Accordingly, they argue that La. R.S. 14:61 broadly prohibits a substantial amount of protected speech.

---

[34] *United States v. Salerno*, 481 U.S. 739, 745 (1987).
[35] *United States v. Williams*, 553 U.S. 285, 292 (2008).
[36] *Carmouche*, 449 F.3d at 662.
[37] *Seals*, 898 F.3d at 593 (5th Cir. 2018), as revised (Aug. 9, 2018) citing *United States v. Stevens,* 559 U.S. 460, 473 (2010).
[38] ECF No. 93-2, Statement of Material Facts ¶¶ 1-9.

### 1.  Is La. R.S. 14:61 a Content-Based Regulation of Protected Speech?

The level of scrutiny applied to a restriction on protected speech "turns on whether the restriction is content-based or content-neutral."[39] Content-based regulations are presumptively invalid under the First Amendment and courts apply a "strict scrutiny" standard to those regulations.[40] A speech restriction "is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed."[41] This inquiry "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."[42] In *Reed v. Town of Gilbert, Arizona*, the Supreme Court explained that some content-based distinctions are "obvious" insofar as they define speech "by particular subject matter," whereas others "are more subtle, defining regulated speech by its function or purpose."[43] However, "[b]oth are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny."[44] According to the Supreme Court in *Reed*, a separate category of laws may be facially neutral, but still content based, if they cannot be "justified without reference to the content of the regulated speech" or if they were "adopted by the government 'because of disagreement with the message [the speech] conveys.'"[45] Applying this analysis in *Reed*, the Supreme Court found that a town's sign ordinance was content based on its face because it exempted from certain permitting requirements three categories of signs, namely ideological signs, political signs, and temporary-event signs, which were exempted based only on the contents of the messages they expressed.[46]

---

[39] *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228-30 (1987).
[40] *Perry*, 460 U.S. at 45.
[41] *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155, 163 (2015).
[42] *Id*.
[43] *Id*. at 163, 135 S. Ct. 2218.
[44] *Id*.
[45] *Id*. (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).
[46] *Id*. at 164–65, 135 S.Ct. 2218.

La. R.S. 14:61 does not regulate speech in the traditional sense—i.e., written or spoken words—but addresses purely conduct. Specifically, it proscribes:

(1) Entering any structure or premises that qualifies as "critical infrastructure" that is "completely enclosed by any type of physical barrier;"

(2) Using "fraudulent documents for identification purposes" in order to gain entry to a critical infrastructure; [47]

(3) Refusing to leave the premises that make up critical infrastructure "after been having forbidden to do so, either orally or in writing . . .;" and

(4) Intentionally entering, without authority, any restricted area of a critical infrastructure "which is marked as a restricted or limited access area that is completely enclosed by any type of physical barrier . . . ."[48]

This statutory provision is essentially a trespass statute that targets and provides enhanced protection for a specific type of real property—property containing "critical infrastructure" as defined in the statute. Like a traditional trespass statute, it proscribes unauthorized entry onto critical infrastructure covered the statute.

The fact that La. R.S. 14:61 targets conduct does not end the inquiry because conduct may be "sufficiently imbued with elements of communication to fall within the scope of the [First Amendment]."[49] So-called "symbolic expression" or "expressive conduct" includes conduct that delivers a message "that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative"[50] The classic example of symbolic speech or expressive conduct is peaceful picketing or demonstrations that express a message or viewpoint.[51] In the present case, Plaintiffs argue that La. R.S. 14:61 broadly proscribes a substantial amount of protected speech in the form of picketing and demonstrations targeting pipeline projects. The

---

[47] La. R.S. 14:61(A)(2) refers to the "use of fraudulent documents for identification purposes." Plaintiffs do not address this portion of the statute in their complaint or their Rule 56(f) Response.
[48] La. R.S. 14:61.
[49] *Spence v. State of Wash.*, 418 U.S. 405, 409-11 (1974).
[50] *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293-94 (1984).
[51] *Committee in Solidarity With People of El Salvador ("CISPES") v. F.B.I.*, 770 F.2d 468, 473 (1985).

restrictions on unauthorized entry in La. R.S. 14:61(A)(1) through A(4) do not expressly regulate or restrict pickets, demonstrations, or other expressive activity. However, putting aside the statute's First Amendment carve-out in section 14:61(D)(1) for the moment, the statute may also reach protected expressive conduct targeting pipelines or other critical infrastructure by restricting unauthorized entry. In other words, La. R.S. 14:61 may incidentally impact expressive conduct protected by the First Amendment.

Unlike the ordinance at issue in *Reed*, La. R.S. 14:61 does not, on its face, restrict symbolic speech or expressive conduct based on the idea or message expressed. Instead, it proscribes entry onto premises containing critical infrastructure without reference to the purpose of that entry or the ideas or message advanced by those who enter the premises.[52] However, Plaintiffs argue that La. R.S. 14:61(D)(1), which creates a "carve-out" for "picketing," "demonstration," and other forms of symbolic expression, introduces content-based restrictions on protected speech. That carve-out provision states:

> Nothing in this Section shall be construed to apply to or prevent the following…
> [l]awful assembly and peaceful and orderly petition, picketing, or demonstration
> for the redress of grievances or to express ideas or views regarding legitimate
> matters of public interest, including but not limited to any labor dispute between
> any employer and its employee or position protected by the United States
> Constitution or the Constitution of Louisiana.

While the Fifth Circuit has observed that a similar First Amendment carve-out could not save an otherwise invalid statute, such a carve-out can "validate a construction of the statute which avoids its application to protected expression."[53] Plaintiffs argue that La. R.S. 14:61(D)(1) creates content-based restrictions in at least two respects.

---

[52] La. R.S. 14:61(A)(2) does refer to the "use of fraudulent documents for identification purposes." Fraudulent statements, however, are not protected speech under the First Amendment. *See McIntyre v. Ohio Elections Com'n*, 514 U.S. 334-357 (1995).
[53] *CISPES,* 770 F.2d at 474.

First, they point to the provision's reference to "ideas or views regarding legitimate matters of public interest" and argue that this is a content-based distinction that discriminates based on whether the symbolic speech at issue involves matters of public interest.[54] They contend that this language provides government decision makers with overly broad discretion in determining when the protest or picketing activities at issue involve legitimate matters of public interest. A fair reading of section 14:61(D)(1) does not support the Plaintiffs' position that it creates content-based distinctions. Plaintiffs' argument focusses on isolated language in section 14:61(D)(1) without reading that language in the context of the entire provision. Specifically, the carve-out provision exempts "[l]awful assembly and peaceful and orderly petition, picketing, or demonstration" that involve  "the redress of grievances" *or* the expression of "ideas or views regarding legitimate matters of public interest…."[55] The provision then goes on to provide non-exclusive examples of legitimate matters of public interest—"*including but not limited to* any labor dispute between any employer and its employee or *position protected by the United States Constitution or the Constitution of Louisiana*."  Section 14:61(D)(1) thus ends with a broad "catch-all" clause that extends the exemption to any protest, demonstration, picket, or other expressive conduct protected by the First Amendment without regard to the content of the message conveyed.

Second, Plaintiffs argue in their Rule 56(f) Response that the reference to "labor disputes" in section 14:61(D)(1) is a content-based distinction that favors a certain type of speech based on the content of the speech. The Court agrees with Plaintiffs that, if section 14:61(D)(1) provided a carve-out solely for labor disputes, there is a compelling argument that the statute makes a content-based distinction. But section 14:61(D)(1) does not limit the carve-out to labor disputes. Again, Plaintiffs' argument takes this reference out of context. As previously noted, the statute cites labor

---

disputes as one of the *non-exclusive* examples of legitimate matters of public interest and includes a broad catch-all for all speech protected by the Constitution. The Court construes this language to exempt all protected speech regardless of content. Accordingly, the reference to "labor disputes" in section 14:61(D)(1) does not render the statute a content-based regulation of protected speech.

The Plaintiffs next argue that La. R.S. 14:61 is content-based because the legislative history of the statute shows that it was promoted by the Louisiana Mid-Continental Oil and Gas Association to squelch protests against pipeline projects.[56] They allege that the 2018 amendment to the statute adding pipelines to the definition of "critical infrastructure" occurred "at a time when environmental activists' challenges to the danger of pipeline activity were on the rise."[57] The Plaintiffs contend that the 2018 pipeline amendment to the statute "was initiated by leaders of the oil and gas industry who have obviously vested and financial interest in skewing the debate about the dangers of continued pipeline expansion."[58] In this regard, they point to evidence that the 2018 amendment to La. R.S. 14:61 was drafted by the general counsel of the Louisiana Mid-Continental Oil and Gas Association.

The Supreme Court has held that a statute is not rendered a content-based restriction on free speech merely because statute's "enactment was motivated by the conduct of the partisans on one side of a debate."[59] More importantly, the legislative history cited by the Plaintiffs actually refutes their argument that the 2018 pipeline amendment to La. R.S. 14:61 was intended to squelch pipeline protests and environmental activists' opposition to pipeline projects like the Bayou Bridge Pipeline. Specifically, the Plaintiffs quote the lead sponsor of the 2018 amendment explaining that the statute "does nothing to impact the ability to peacefully protest … [but] only comes into play

---

[56] ECF No. 96-1 at 9.
[57] *Id*. at 13.
[58] *Id*.
[59] *Hill v. Colorado*, 530 U.S. 703, 724 (2000).

when there is damage to that critical infrastructure, so if you don't damage anything, this law does not apply."[60] Damage caused to critical infrastructure does not fall within the protections of the First Amendment given that courts have repeatedly held that the First Amendment protects only "peaceful" picketing and protest activities.[61] Moreover, the statute's carve-out for protected First Amendment speech "is a valuable indication of [legislative] concern with the preservation with First Amendment rights in the specific context of the statute in question."[62]

In their Rule 56(f) Response, Plaintiffs fault this analysis of the legislative history, arguing that the Court's analysis improperly adds a requirement to La. R.S. 14:61 that the critical infrastructure be damaged in some way for the statute to apply.[63] They argue that the text of the statute does not require a finding that critical infrastructure was damaged to trigger the statute's criminal penalties. Plaintiffs are correct that La. R.S. 14:61 does not require this finding. Indeed, another statutory provision, La. R.S. 14:61.1, creates a separate criminal penalty for causing damage to critical infrastructure, including pipelines. This provision appears to have been enacted at the same time as the pipeline amendment to La. R.S. 14:61. In their original Motion for Summary Judgment, Plaintiffs pointed to other statements by sponsors of the pipeline amendment and La. R.S. 14:61.1 to argue that these statutes were backed by the pipeline industry to squelch environmental protests. The statements of the sponsors cited by the Court reflect broader concerns by legislators about protecting pipelines and other critical infrastructure (including protection from damage), not a concern about squelching otherwise peaceful protest activities. This legislative

---

[60] ECF No. 96-1 at 10.
[61] *United States v. Grace*, 461 U.S. 171, 176 (1983) ("there is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving speech protected by the First Amendment.").
[62] *CISPES*, 770 F.2d at 474.
[63] ECF No. 129-1 at 3.

history undercuts Plaintiffs' argument that the legislative purpose of the pipeline amendment to La. R.S. 14:61 was to impose content-based restrictions on protected speech.

In sum, La. R.S. 14:61 is content-neutral to the extent that it impacts protected speech. Accordingly, the statute is not subject to strict scrutiny.

### 2.  Consideration of Forum.

Given that strict scrutiny does not apply to La. R.S. 14:61, the Court must next address the nature of the forums impacted by the statute. "The scope of [a plaintiff's] First Amendment rights depends on the nature of the forum in which he seeks access."[64] The nature of forum impacts the level of scrutiny applied to restrictions on protected speech occurring within that forum. Courts have identified three types of forums: "the traditional public forum, the designated public forum, and the non-public forum."[65] A "non-public forum" is publicly-owned property that is not by tradition or government designation a forum for public communication.[66] A "public forum, on the other hand," are those places "which by long tradition or by government fiat have been devoted to assembly and debate."[67] A "designated public forum," is a forum the government designates as "a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects."[68] First Amendment protections are broadest with respect to protected speech occurring in a traditional public forum.[69] In a non-public forum, however, "an individual's First Amendment right to expression is at its nadir."[70]

---

[64] *Imani v. City of Baton Rouge*, No. 17-439, 2022 WL 2760799 at *17 (M.D. La. July 14, 2022) (quoting *Estiverne v. Louisiana State Bar Ass'n*, 863 F.2d 371, 376 (5th Cir. 1989)).
[65] *United Food & Commercial Workers Local 1099 ("United Food") v. City of Sidney*, 364 F.3d 738, 746 (6th Cir. 2004).
[66] *Id.*
[67] *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 44 (1983).
[68] *Cornelius v. NAACP Legal Defense & Education Fund, Inc*., 473 U.S. 788, 800 (1985).
[69] *Imani*, 2022 WL 2760799 at *17-18.
[70] *Caputo*, 201 F.Supp.3d 65, 70 (D.C. 2016).

### a. Private Property.

While not expressly limited to private property, the statute's entry restrictions appear framed to largely impact structures on private property. Two of the three relevant entry restrictions refer to "structures" or "premises … belonging to another" and "completely enclosed by … [a] physical barrier." The third restriction prohibits "remaining" on the premises of critical infrastructure by any "owner, lessee, or custodian of the property or by any other authorized person." Moreover, many of the types of structures protected—pipelines, chemical manufacturing facilities, refineries, etc.—are traditionally private property. Indeed, the summary judgment record indicates that Bayou Bridge Pipeline is owned by a private entity and the pipeline protest in 2016 occurred on private property.[71] Plaintiffs' First Amendment claims fail to the extent that La. R.S. 14:61 impacts speech on private property because there is no First Amendment right to trespass on private property to conduct protests or other forms of symbolic speech.[72] Specifically, courts have recognized that the "right to exclude others is a fundamental element of private property ownership, and the First Amendment does not create an absolute right to trespass."[73] While the protections of the First Amendment may apply to private property that has been "devoted to a public use,"[74] the type of property affected by La. R.S. 14:61—critical infrastructure that, in most

---

[71] ECF No. 93-7, Declaration of Peter Aaslestad.

[72] *Id.*; see also *Lloyd Corp., Limited v. Tanner*, 407 U.S. 551, 567 (1972). In *Tanner* the Supreme Court observed:

> Although accommodations between the values protected by [the First, Fourteenth and Fifth] Amendments are sometimes necessary, and the courts properly have shown a special solicitude for the guarantees of the First Amendment, this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatory for private purposes only . . . .
> *Id.*

[73] *See, e.g., Armes v. City of Philadelphia*, 706 F. Supp. 1156, 1164-66 (E.D. Pa. 1989).

[74] *Cornelius*, 473 U.S. at 801 (1985) ("[A] speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns.").

cases, is enclosed physical barriers—is typically not devoted to public use or otherwise open to the public for protected First Amendment activities.

The Plaintiffs counter that they had the permission of the Landowner Plaintiffs to enter the property where the Bayou Bridge Pipeline protest occurred. However, if true, it is unclear that permission to enter the property changes the result as far as the First Amendment. The nature of the forum remains the same: it is private property and the Bayou Bridge Pipeline is owned by a private entity.[75] Private property does not "lose its private character merely because the public is generally invited to use it for designated purposes."[76] Moreover, the Landowner Plaintiffs are not the sole owners of the property.[77] As the Attorney General pointed out in his opposition, another co-owner of the same property, Dominic Giampula, authorized Bayou Bridge Pipeline, LLC to exercise his right to exclude the protesters from his property and, if required, "contact law enforcement on my behalf in the event that I am unavailable and a trespass occurs."[78] The Attorney General argues that, under Louisiana law, as "against third persons, a co-owner has the right to use and enjoy the thing as if he were the sole owner," including the right to exclude third-party trespassers.[79] The Court agrees with the AG's argument that the First Amendment does not eliminate Giampula's right, as an owner of private land, to exclude the Plaintiffs and other protestors from his property.[80]

---

[75] ECF No. 93-4 at 345 (identifying Bayou Bridge Pipeline, LLC as the owner).
[76] *Tanner*, 407 U.S. at 570.
[77] The Landowner Plaintiffs held fractional interests in the property where the protest occurred of 0.0005803, 0.0005803, and 0.0000994, respectively.
[78] ECF No. 93-4 at 345.
[79] La. C.C. Art. 802. The Attorney General also cites the commentary to that civil code article, which states that "a co-owner, may *alone* take all the necessary steps for preservation of the property, including the institution of suits against trespassers or usurpers." ECF No. 119 at 19 (emphasis added).
[80] *Armes*, 706 F. Supp. at 1164-66.

### b. Non-Public Forum.

The Court also considers that the statute's definition of critical infrastructure includes structures that arguably could be owned and operated by government actors—for example, "electrical power generating facilities," "electrical transmission substations," "water intake structures and water treatment facilities," and "ports." However, even if La. R.S. 14:61 impacts speech or expressive conduct on public property, "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government."[81] "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."[82] Access to a nonpublic forum can be regulated "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."[83] In *Greer v. Spock*, for example, the defendants challenged a regulation banning "speeches and demonstrations of a partisan political nature" and prohibiting "the distribution of literature without prior approval" at Fort Dix.[84] The Supreme Court examined the purpose of federal military reservations such as Fort Dix—"to train soldiers, not to provide a public forum"—as well as the "the historically unquestioned power of its commanding officer summarily to exclude civilians from the area of his command."[85] The Supreme Court observed that use of the military reservation as a traditional public forum for speech and expressive conduct would run counter to the use to which Fort Dix was dedicated: "the notion that federal military reservations, like municipal streets and parks, have traditionally served as a place for free public assembly and communication of thoughts by private citizens is … historically and

---

[81] *United States Postal Service v. Council of Greenburgh Civic Ass'n*, 453 U.S. 114, 129 (1981).
[82] *Greer v. Spock*, 424 U.S. 828, 836 (1976).
[83] *Cornelius*, 473 U.S. at 49.
[84] 424 U.S. at 830.
[85] *Id.* at 838.

constitutionally false."[86] The Supreme Court concluded that Fort Dix was not a public forum, and that the challenged regulation was viewpoint neutral and reasonable in light of the purpose for the military reservation.

Here, La. R.S. 14:61 targets and protects structures that, like the military reservations at issue in *Greer*, serve very specific and important purposes unrelated to public speech—the provision of water, electricity, transportation, and energy production. The statute is also limited to facilities enclosed by a physical barrier,[87] or premises where the public has been expressly forbidden to enter or remain on the property.[88] There is no evidence in the summary judgment record that the statute applies to traditional public forums or to facilities that have been opened to the public as limited public forums. Accordingly, applying *Greer*, the statute does not violate the First Amendment if its restrictions are reasonable and viewpoint neutral. The statute's restrictions appear reasonable in light of the purpose of the statute—the protection of critical infrastructure facilities. Moreover, as explained above, the statute contains a carve-out excluding expressive conduct protected by the First Amendment. The statute's entry restrictions also do not discriminate on the basis of the viewpoint of any expressive conduct they may impact—they apply across the board.

### c.  Does Section 14:61(A)(3) Prohibit Speech in Traditional Public Spaces?

In their Rule 56(f) Response, Plaintiffs argue that the Court failed to consider the breadth of the restriction in La. R.S. 14:61(A)(3) in denying their original Motion for Summary Judgment. Section 14:61(A)(3) states that the "unauthorized entry of a critical infrastructure" includes "remaining upon or in the premises of a critical infrastructure after having been forbidden to do

---

[86] *Id.*
[87] La. R.S. 14:61(A)(1) and (4).
[88] La. R.S. 14:61(A)(3).

so, either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person."[89] Plaintiffs point out that, unlike La. R.S. 14:6114:61(A)(1) and La. R.S. 14:61(A)(4), section 14:61(A)(3) applies to premises that are not "enclosed by a physical barrier" or "marked as a restricted or limited access area." They argue that this more expansive provision implicates greater First Amendment concerns because of the nature of underground pipelines. In this regard, they argue that section 14:61(A)(3) would criminalize activities in "traditional public spaces like parks, streets, sidewalks, government buildings, the State Capitol, schools, and public restrooms" because "[v]irtually every modern park, street, and building has a pipeline of some kind, particularly water, running in, under, near, or through it."[90]

Plaintiffs are correct that the scope of La. R.S. 14:61(A)(3) is broader than the entry restrictions of sections 14:61(A)(1), (A)(2), and (A)(4). But the text of section 14:61(A)(3) does not support the broad, unbounded application proposed by Plaintiffs. Specifically, section 14:61(A)(3) applies to the "premises of a critical infrastructure" where an "owner, lessee, or custodian" of that property has forbidden someone from remaining on the premises—in other words, that "owner, lessee, or custodian" of the property has exercised his, her, or its right to exclude others from the property.[91] The statute thus presupposes that the "owner, lessee, or custodian" has the power to restrict entry or exclude others from the "premises." This power is the hallmark of private property ownership and government property not designated as limited public forums, not the "traditional public spaces" cited by plaintiffs. Plaintiffs have not cited, nor has the Court found, any authority under Louisiana property law that would allow the owner of an underground pipeline to exercise a broad right to control access to "traditional public spaces like

---

[89] La. R.S. 14:61(A)(3).
[90] ECF No. 129-1 at 7.
[91] La R.S. 14:21(A)(3).

parks, streets, sidewalks, government buildings, the State Capitol, schools, and public restrooms" located in the path of the underground pipeline. Accordingly, the Court construes the term "premises" in La. R.S. 14:61(A)(3) to mean property over which the "owner, lessee, or custodian" of the critical infrastructure has the right under state law to control access to or otherwise exclude others from the property. That right does not exist with respect to the traditional public forums cited by Plaintiffs.[92] In sum, La. R.S. 14:61(A)(3) does not proscribe protected speech in traditional public forums.

### 3. The *O'Brien* Test.

Even if La. R.S. 14:61 incidentally restricts speech in public forums, content-neutral regulations of symbolic speech receive a lesser degree of scrutiny under the test set forth in *United States v. O'Brien*.[93] The Supreme Court's *O'Brien* test is the proper "analytical framework to evaluate content-neutral restrictions on expressive activities."[94] Under *O'Brien,* a content-neutral restriction on expressive conduct survives constitutional scrutiny if (1) it is within the constitutional power of the government, (2) it furthers an important or substantial government interest, (3) the interest is unrelated to the suppression of expression, and (4) the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest.[95]

### a. The First, Second and Third *O'Brien* factors.

With respect to the first *O'Brien* factor, the parties do not appear to challenge the state's constitutional power to enact a statute protecting critical infrastructure located within its borders.

---

[92] Even if La R.S. 14:21(A)(3) could be construed as broadly as suggested by Plaintiffs, the Court's construction of the statute avoids constitutional infirmities. As explained by the Supreme Court "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *Jones v. United States*, 526 U.S. 227, ——, 119 S.Ct. 1215, 1222 (1999) (internal citations omitted).

[93] 391 U.S. 367 (1968).

[94] *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282-83 (5th Cir. 2001).

[95] *O'Brien*, 391 U.S. at 377.

Nor do they challenge the constitutionality of state enactments proscribing trespass on private property in general. La. R.S. 14:61 thus appears to fall squarely within the police powers of the state—"the protection of the lives, health, and property of [Louisiana] citizens, maintenance of good order, and the preservation of the public good."[96] The Court also finds that the Attorney General's argument that (1) the protection of critical infrastructure in the state furthers an important or substantial government interest, and (2) the protection of this property from damage caused by unauthorized entry is unrelated to the suppression of expressive conduct persuasive. As the Court previously explained, the statute on its face targets trespassing onto critical infrastructure, not traditional speech protected by the First Amendment. Nor does it target expressive activity, such as protests and picketing. Specifically, the First Amendment carve-out discussed above exempts protests and picketing protected by the First Amendment.

###### b.  The Fourth *O'Brien* factor.

Plaintiffs' primary argument appears to be grounded on the fourth *O'Brien* factor— whether any incidental restrictions on First Amendment activities resulting from La. R.S. 14:61 is no more than necessary to facilitate the state's interest in protecting critical infrastructure. Plaintiffs contend that La. R.S. 14:61 does not withstand intermediate scrutiny because it is not "narrowly tailored to serve a significant government interest."[97] They argue that existing Louisiana statutes criminalizing simple and aggravated damage to property (La. R.S. 14:55-56), damage to critical infrastructure (La. R.S. 14:61.1), and contamination of water supplies (La. R.S. 14:58) are sufficient to address the government's interest in protecting critical infrastructure, yet burden protected speech less than the entry restrictions of La. R.S. 14:61. The Attorney General, however, argues that the government interest with respect to critical infrastructure is broader than preventing

---

[96] *Mugler v. Kansas*, 123 U.S. 623 (1887).
[97] ECF No. 129-1 at 5.

damage to pipelines and other critical infrastructure but also extends to regulating entry onto the premises of critical infrastructure.[98] The Attorney General argues that punishing unauthorized entry ensures the security of critical infrastructure and the safety of the community.[99] The Attorney General also argues that protecting the private property interests of the owners of critical infrastructure is a significant government interest advanced by La. R.S. 14:61.[100]

Plaintiffs frame their intermediate scrutiny argument in terms of the traditional legal standards governing "time, manner, and place" regulations, not *O'Brien*. But the Fifth Circuit has noted that *O'Brien* is "a variant of those [traditional legal]standards" and these standards are thus applicable to the fourth prong of the *O'Brien* test: whether the incidental restriction on protected speech is no greater than necessary to further the government's interest.[101] Under this standard, the challenged regulation need not satisfy the more demanding "least restrictive means" standard.[102] Rather, the standard requires only that "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests *but that it need not be the least restrictive or least intrusive means of doing so*."[103]

Here, La. R.S. 14:61 furthers the government's interest in protecting critical infrastructure and the community by prohibiting and penalizing unauthorized entry onto critical infrastructure before those structures can be damaged or otherwise compromised. These entry restrictions would conceivably provide more protection than the statutory provisions cited by Plaintiffs that only target damage to critical structures after the fact. Plaintiffs also point to the fact that the criminal penalties for violations of La. R.S. 14:61 are more severe than criminal penalties for violating the

---

[98] ECF No. 131 at 8-9.
[99] *Id.*
[100] *Id.*
[101] *Doe v. Landry*, 909 F.3d 99, 111 (5th Cir. 2018).
[102] *Id.*
[103] *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989) (emphasis added).

trespass statutes that apply to other types of property.[104] The government, however, could reasonably conclude that a trespass onto the premises of critical infrastructure poses greater security and safety risks than a trespass onto other types of property, and thus impose heavier criminal sanctions with respect to critical infrastructure.

The next question is whether La. R.S. 14:61 is narrowly tailored to serve the government's interest. In other words, does the statute sweep too broadly and prohibit more protected speech than necessary. The Court concludes that it does not. La. R.S. 14:61 targets trespasses on the premises of critical infrastructure but limits criminal sanctions to four specific cases:

- Unauthorized entry onto the premises of critical infrastructure where these premises are enclosed by a physical barrier (La. R.S. 14:61(A)(1));

- Use of fraudulent identification documents to gain entry onto the premises of critical infrastructure (La. R.S. 14:61(A)(2));

- "Remaining upon or in the premises of a critical infrastructure after having been forbidden to so" by an owner, lessee, or custodian (or their agent) of that critical infrastructure (La. R.S. 14:61(A)(3)); and

- Intentionally entering a restricted area of the premises of a critical infrastructure that is marked as restricted and enclosed by a physical barrier (La. R.S. 14:61(A)(4)).

In two of the cases, the statute's reach is limited to areas surrounded by a physical barrier that presumably restricts entry and provides notice of entry into a non-public area.[105] In each of these cases, the statute does not prevent Plaintiffs from staging protests in traditional public spaces or, indeed, immediately beyond the premises of a critical infrastructure. Plaintiffs' position that the statute sweeps too broadly appears to be based on their argument that the statute does not define the term "premises" in La. R.S. 14:61(A)(3) and that, given the ubiquity of underground pipelines, the statute could criminalize protests in traditional public spaces where there is no notice that a

---

[104] ECF No. 129-1 at 5-6.
[105] La. R.S. 14:61(A)(1), (A)(4).

pipeline exists. However, as the Court explained above, the term "premises" in La. R.S. 14:61(A)(3) should be construed as the property over which the "owner, lessee, or custodian" of the critical infrastructure has power under state law to exclude others from the property. Accordingly, La. R.S. 14:61(A)(3) would not apply broadly to the traditional public spaces cited by Plaintiffs. Finally, any incidental effect on protected speech is further minimized by the First Amendment carve-out in La. R.S. 14:61(D)(1).

The Court concludes that La. R.S. 14:61 is narrowly tailored to address the government's significant interest in protecting critical infrastructure and that the statute, therefore, satisfies all four of the *O'Brien* factors.

### 4.  The Court's Ruling With Respect to Plaintiffs' Facial Challenge to the Statute.

In sum, La. R.S. 14:61 does not, on its face, restrict speech but expressly exempts protected First Amendment expressive conduct from the reach of the statute's prohibitions. Even if the statute incidentally reaches some protected conduct, it is not content-based and satisfies the Supreme Court's *O'Brien* test. Accordingly, the Court GRANTS summary judgment under Rules 56(a) and 56(f) in favor of the defendants. Plaintiffs' claims are dismissed to the extent that they are grounded on a facial challenge in La. R.S. 14:61.

### B.    First Amendment "As Applied" Challenge.

The Plaintiffs also mount an "as applied" challenge to La. R.S. 14:61. In other words, they argue that the statute is unconstitutional as applied to their protests against the Bayou Bridge Pipeline even if the statute is facially valid. In his original Motion for Summary Judgment, defendant Duhé argued that Plaintiffs did not have standing to challenge La. R.S. 14:61 because he had waived further prosecution of Plaintiffs under that statute. Specifically, Duhé filed an affidavit stating that, in a July 7, 2021 letter to the Plaintiffs' counsel, he "affirmatively disavowed any

intent to prosecute White Hat, Mejia, and Savage (and others) for any alleged acts arising out the alleged events occurring from August 2018 through September 2018, which include the acts they have alleged to have taken on the date of their arrests."[106] Duhé further states in his affidavit that, in his letter, he "affirmatively disavow[ed] any *future* prosecution of White Hat, Mejia, Savage, or any of the individuals listed in [his] letter based on the events that allegedly took place in St. Martin Parish from August 2018 through September 2018 for which they were arrested."[107] In addition to Duhé's disavowal of prosecution, the statute of limitations with respect to the 2018 arrests lapsed in September 2022.[108]

These subsequent developments implicate the mootness doctrine, not standing. The Fifth Circuit has described "mootness" as "the doctrine of standing in a time frame."[109] In other words, a plaintiff must not only establish that he or she has standing under Article III at the commencement of the case, the plaintiff's personal stake that "exist[ed] at the commencement of the litigation (standing)" must "continue throughout [the case's] existence (mootness)."[110] Accordingly, even if a plaintiff has standing at the commencement of the case, the case may nevertheless become moot by events that occur during litigation and eliminate the plaintiff's personal interest in the case.[111] Here, Duhé argues that his disavowal of prosecution eliminates the plaintiff's personal stake in the case. Plaintiffs counter that the District Attorney's disavowal of prosecution does not moot their claims because the disavowal is not legally binding and Duhé could reverse course.

---

[106] ECF No. 94-3 at ¶¶ 6-7.
[107] *Id*. at ¶ 8 (emphasis added).
[108] La. C.Cr.P. art. 572(A)(2) provides for a time limitation of four years.
[109] *Centers for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5ᵗʰ Cir. 2006) (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)).
[110] *Id*.
[111] *Pool v. City of Houston*, 978 F.3d 307, 313 (5th Cir. 2020).

Courts closely scrutinize mootness arguments that are based on a "voluntary cessation of a challenged activity."[112] A voluntary cessation of challenged conduct moots a First Amendment claim only if it is "absolutely clear that the allegedly wrongful behavior could not be reasonably expected to reoccur."[113] For example, in *Pool v. the City of Houston*, the City disavowed enforcement of a "zombie" city charter provision that allowed only registered voters to circulate petitions for initiatives and referenda.[114] The City argued that its post-suit disavowal of the provision mooted the plaintiff's constitutional challenge.[115] The Fifth Circuit disagreed, noting that the charter provision was not formally repealed and it was unclear whether the City's mere disavowal of enforcement was legally binding.[116] Similarly, in *Speech First, Inc. v. Fenves*, the court held that the University of Texas' post-suit amendments to a speech code did not moot the plaintiff's constitutional challenge to that code.[117] According to the court, the First Amendment challenge was not moot because, in part, the University had "not issued a controlling statement of future intention," and that there was nothing preventing the University from restoring the challenged provisions of the speech code.[118]

Duhé's disavowal of prosecution falls within this exception to the mootness doctrine. It is unclear from the record and the relevant authorities that the District Attorney's disavowal is legally binding and that it would prevent him from reversing course in the future. Indeed, Duhé's disavowal is limited to the protest and events that resulted in the 2018 arrest of the pipeline protestors, including the Plaintiffs. He does not disavow enforcement of La. R.S. 14:61 in connection with future protests of the Bayou Bridge Pipeline. On the other hand, the lapse of

---

[112] *Speech First, Inc. v. Fenves*, 979 F.3d. 319, 328 (5th Cir. 2020).
[113] *Id.*
[114] 978 F.3d. at 313-14.
[115] *Id.*
[116] *Id.*
[117] 979 F.3d. at 328.
[118] *Id.*

limitations is not a "voluntary cessation" of the enforcement of a challenged statute and moots any claims by the Plaintiffs based on their 2018 protest and arrest.

To the extent that Plaintiffs seek a declaration that the statute is unconstitutional as applied to a future anticipated protests of the Bayou Bridge Pipeline on private property, the Plaintiffs lack a constitutionally protected right to protest on private property. Even if the Plaintiffs intend to challenge the application of La. R.S. 14:61 to protest activities on public property, courts generally apply the *O'Brien* framework for "as applied" challenges to content-neutral speech regulations.[119] As explained above, the statute is content neutral and satisfies all four of the *O'Brien* requirements. Accordingly, the Plaintiffs cannot maintain an "as applied" challenge to La. R.S. 14:61 based on the summary judgment record and relevant authorities.

## IV.
### DUE PROCESS CHALLENGE

Finally, the Plaintiffs contend that L.A. R.S. 14:61 is unconstitutionally vague and, therefore, violates the Due Process Clause of the Fourteenth Amendment. A law is unconstitutionally vague when it "(1) fails to apprise persons of ordinary intelligence of the prohibited conduct, or (2) encourages arbitrary and discriminatory enforcement."[120] Mere imprecision does not render a statute vague.[121] In fact, "[a] facial challenge for vagueness is appropriate only on an allegation that the law is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all."[122]

---

[119] *Caputo*, 201 F.Supp.3d at 71.
[120] *City of Chicago v. Morales*, 527 U.S. 41, 90 (1999).
[121] *Ferguson v. Estelle*, 718 F.2d 730, 735 (5th Cir. 1983).
[122] *Id*. (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971)).

La. R.S. 14:61 is not unconstitutionally vague under these standards. Three of the statute's entry restrictions provide clear notice to any ordinary person of the conduct that is prohibited. Section 14:61(A)(1) prohibits entry into the premises of critical infrastructure that is "enclosed by any type of physical barrier." Section 14:61(A)(4) restricts access to restricted or limited access areas of critical infrastructure that is similarly "enclosed by any type of physical barrier" and "marked as a restricted or limited access area." While the restriction in Section 14:61(A)(3) is not limited to areas surrounded by a physical barrier, it proscribes conduct only ***after*** an "authorized person" instructs the trespasser to leave the premises orally or in writing. The Court concludes that the operative language of Section 14:61 provides any ordinary person with sufficient notice of the conduct it proscribes and that it provides specific standards sufficient to prevent arbitrary enforcement.[123]

In their Rule 56(f) Response, Plaintiffs' Due Process argument appears to rest, in part, on their broad reading of Section 14:61(A)(3) and their argument that this provision, when applied to underground pipelines, fails to provide adequate notice or "minimal standards to govern law enforcement."[124] However, the Court previously concluded that the term "premises" referenced in Section 14:61(A)(3) do not encompass traditional public spaces. Specifically, the Court construes the term "premises" in La. R.S. 14:61(A)(3) to mean property over which "owner, lessee, or custodian" of that property has the right under state law to control access to or otherwise exclude others from the property.

---

[123] *See, e.g., Caputo,* 201 F.Supp.3d at 72 (concluding that restriction against unauthorized entry onto the grounds of the White House was not unconstitutionally vague because the "White House's perimeter, demarcated by an imposing fence and manned by scores of Secret Service agents, unambiguously provides ordinary people with fair notice that unauthorized entry onto the grounds is unlawful.").

[124] ECF No. 129-1 at 11-12.

In sum, the Court grants summary judgment on plaintiff's vagueness challenge under the Due Process clause and, therefore, dismisses those claims.

## V.
### CONCLUSION

For the foregoing reasons, the Court GRANTS summary judgment in favor of the defendants under Rules 56(a) and 56(f) and DISMISSES Plaintiffs' First Amendment and Due Process claims WITH PREJUDICE.

THUS DONE in Chambers on this 5th day of April, 2024.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE