# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 20, 2025

Lyle W. Cayce
Clerk

————————

No. 24-30272

————————

Anne White Hat; Ramon Mejia; Karen Savage; Sharon Lavigne; Harry Joseph; John Lambertson; Peter Aaslestad; Theda Larson Wright; Alberta Larson Stevens; Judith Larson Hernandez; RISE St. James; 350 New Orleans; Louisiana Bucket Brigade,

*Plaintiffs—Appellants,*

*versus*

Elizabeth B. Murrill, *in her official capacity as Attorney General of Louisiana*; M. Bofill Duhe, *in his official capacity as District Attorney of the 16th Judicial District Attorney's Office*; Becket Breaux, *in his official capacity as Sheriff of St. Martin Parish*,

*Defendants—Appellees.*

————————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:20-CV-983

————————————————————

Before Graves, Higginson, and Wilson, *Circuit Judges.*

James E. Graves, Jr., *Circuit Judge*:

Plaintiffs, comprised of ten individuals and three community organizations, appeal the district court's grant of summary judgment in favor of three Louisiana officials. They chiefly contend that amendments to the

No. 24-30272

state's Infrastructure Trespass Statute rendered the law unconstitutionally vague, in violation of the Due Process Clause, and substantially overbroad, in violation of the First Amendment. Because we conclude that the statute in question is neither impermissibly vague nor violative of the First Amendment, we AFFIRM the district court's disposition of this case.

## I.     Factual & Procedural History

### A.     Statutory Background

This appeal centers on constitutional challenges to Louisiana's Infrastructure Trespass Statute, La. R.S. § 14.61.[1] In addition to a general criminal trespass statute, *see* La. R.S. § 14.63, Louisiana specifically criminalizes the "unauthorized entry of a critical infrastructure." La. R.S. § 14.61 ("Infrastructure Trespass Statute" or the "statute"). First-time offenders face a possible fine of up to $1,000, as well as a five-year term of imprisonment. La. R.S. § 14.61(C)(1).

When the Infrastructure Trespass Statute was enacted in 2004, it defined the "[u]nauthorized entry of a critical infrastructure" as:

> the intentional entry by a person without authority into any structure or onto any premises, belonging to another, that constitutes in whole or in part a critical infrastructure that is completely enclosed by any type of physical barrier, including but not limited to: (1) chemical manufacturing facilities; (2) refineries; (3) electrical power generating facilities; (4) water intake structures and water treatment facilities; (5) natural gas transmission compressor stations; (6) LNG terminals and storage facilities; and (7) transportation facilities, such as ports, railroad switching yards, and trucking terminals.

---

[1] Unless specified, this opinion will refer to subsections of the Infrastructure Trespass Statute as enumerated in the current version of the statute.

No. 24-30272

La. R.S. § 14.61 (2004). In subsequent years, the Louisiana Legislature passed legislation that generally broadened the statute's scope. In 2015, for example, the "act" of an "unauthorized entry" was expanded to encompass the following:

> (1) The intentional entry by a person without authority into any structure or onto any premises, belonging to another, that constitutes in whole or in part a critical infrastructure that is completely enclosed by any type of physical barrier.

> (2) The use or attempted use of fraudulent documents for identification purposes to enter a critical infrastructure.

> (3) *Remaining upon or in the premises of a critical infrastructure after having been forbidden to do so, either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person.*

> (4) The intentional entry into a restricted area of a critical infrastructure which is marked as a restricted or limited access area that is completely enclosed by any type of physical barrier when the person is not authorized to enter that restricted or limited access area.

La. R.S. § 14.61 (2015) (emphasis added). Three years later, in 2018, the Legislature worked in bipartisan fashion—though, according to the Plaintiffs, at the behest of lobbyists—to incorporate pipelines within the statute. The definition of "critical infrastructure" was accordingly revised to read:

> *any and all structures, equipment, or other immovable or movable property* located within or upon chemical manufacturing facilities, refineries, electrical power generating facilities, electrical transmission substations and distribution substations, water intake structures and water treatment facilities, natural gas transmission compressor stations, liquefied natural gas (LNG) terminals and storage facilities, natural gas and hydrocarbon storage facilities, transportation

No. 24-30272

> facilities, such as ports, railroad switching yards, *pipelines*, and trucking terminals, water control structures including floodgates or pump stations, wireline and wireless communications and data network facilities, *or any site where the construction or improvement of any facility or structure referenced in this Section is occurring.*

La. R.S. § 14.61(B)(1) (2018) (emphases added). Legislators also added a carveout stating that the statute would not "be construed to apply to or prevent the following":

> (1) Lawful assembly and peaceful and orderly petition, picketing, or demonstration for the redress of grievances or to express ideas or views regarding legitimate matters of public interest, including but not limited to any labor dispute between any employer and its employee or position protected by the United States Constitution or the Constitution of Louisiana.

> (2) Lawful commercial or recreational activities conducted in the open or unconfined areas around a pipeline, including but not limited to fishing, hunting, boating, and birdwatching.

> (3) Nothing in this Section shall be construed to prevent the owner of an immovable [sic] from exercising right of ownership, including use, enjoyment, and disposition within the limits and under the conditions established by law.

La. R.S. § 14.61(D)(1) (2018). These amendments became effective on August 1, 2018—and, as detailed below, were placed into immediate use by local law enforcement authorities.

## B.    The Bayou Bridge Pipeline

In 2018, a pipeline construction company began building the second phase of the Bayou Bridge Pipeline (the "BBP"). The now-complete BBP is a 162-mile pipeline that connects an oil-and-gas hub in Nederland, Texas, with oil refineries in Louisiana. But the BBP's construction was

controversial, as the pipeline's path crossed through at least eight watersheds, including the biodiverse Atchafalaya Basin.

The portion of the BBP that is central to this dispute cuts through a 38-acre tract of land in St. Martin Parish, Louisiana. At the time of the BBP's construction, the parcel was "very remote" and "only accessible by boat." The pipeline company was able to secure easements or right-of-way agreements with about 350 of the over 400 landowners who possessed a fractional property interest in the tract. State court litigation ensued over remaining interests that belonged to nonconsenting and unresponsive owners. In relevant part, the pipeline company sought an expropriation action to assume property interests, while aggrieved landowners—including Katherine[2] and Peter Aaslestad ("the Aaslestads"), and Theda Larson Wright, Alberta Larson Stevens, and Judith Larson Hernandez ("the Larsons")—sought to enjoin further construction. The dispute concluded in December 2018, when a state court approved the expropriation action, but ordered the pipeline company to pay compensation and damages to nonconsenting property owners, including the Aaslestads and Larsons (together, the "Landowner Plaintiffs").

Because the Landowner Plaintiffs failed to secure an immediate injunction, pipeline construction—and related protests—continued on the land tract. On August 18, 2018, just over two weeks after the 2018 amendments to the Infrastructure Trespass Statute went into effect, Plaintiffs Ramon Mejía and Karen Savage were arrested after refusing to leave a suspended structure that was attached to the in-progress pipeline. Two weeks later, on September 3, Plaintiffs Savage and Anne White Hat protested on a dirt berm located in a demarcated right-of-way that had been

---

[2] Katherine Aaslestad passed away in April 2021. Her widower, John Lambertson, replaced her as a party in this suit.

set aside for the pipeline's construction. After performing a number of disruptive activities (*i.e.*, throwing mud into the engines of construction equipment, and locking facilities used by the workers), the protestors agreed to leave for the day on the condition that the construction workers do the same. Two weeks later, Savage and White Hat were arrested for their involvement in the September 3 protest.

Mejía, Savage, and White Hat (the "Arrested Plaintiffs") faced potential prosecution for violating Louisiana's general trespass statute and the Infrastructure Trespass Statute. But the Arrested Plaintiffs claimed that they received permission from the Landowner Plaintiffs to protest on the tract of land; they also noted that the Landowner Plaintiffs ordered that any construction workers be excluded. The pipeline company, meanwhile, maintained that it received the opposite instruction from other co-owners with land interests within the tract: the workers were welcome to build the pipeline, and any protestors were to be ejected. Ultimately, the District Attorney of Louisiana's 16th Judicial District (the "District Attorney") declined to prosecute the Arrested Plaintiffs, and subsequently issued letters that disavowed prosecution for protest activity that occurred between August and September 2018.

## C.    Procedural History

On May 22, 2019, a group of Plaintiffs sued the Louisiana Attorney General (the "Attorney General"), the Sheriff of St. Martin Parish ("Sheriff"), and the District Attorney in the federal district court for the Middle District of Louisiana. Plaintiffs included the aforementioned Arrested and Landowner Plaintiffs, as well as a third group of organizations

and individuals described as "Advocacy Plaintiffs."[3] Their complaint alleged that the Infrastructure Trespass Statute was: facially unconstitutional for vagueness, in violation of the Due Process Clause (Count I), facially overbroad, unconstitutionally discriminatory on the basis of viewpoint, and facially violative of the First Amendment's association and expression rights (Counts II, III, and IV), and unconstitutional as-applied to the Arrested Plaintiffs (Count V).

All of the Defendants sought to dismiss the case on standing or abstention grounds, or alternatively transfer venue to the Western District of Louisiana, where St. Martin Parish is located. The Attorney General also sought to remove himself from the lawsuit, citing the Eleventh Amendment's sovereign immunity doctrine. On July 30, 2020, the district court partially granted the requested relief: it dismissed the claims against the Attorney General, and transferred the remainder of the case to the Western District of Louisiana for further disposition.

After being transferred to the Western District, the remaining Defendants re-urged their dispositive motions. On May 5, 2021, the district court issued an order dismissing the Advocacy Plaintiffs and Landowner Plaintiffs for lack of standing. It concluded that at least some of the Advocacy Plaintiffs had pled a cognizable injury-in-fact, but that those injuries were neither traceable to or redressable by the two remaining Defendants—the District Attorney and Sheriff. As for the Landowner Plaintiffs, the district court concluded that their injuries were, in reality, injuries to the Arrested

---

[3] The Advocacy Plaintiffs include three organizations: 350 New Orleans, Louisiana Bucket Brigade, and RISE St. James, along with two individuals: Sharon Lavigne and Harry Joseph.

No. 24-30272

Plaintiffs, as the Landowner Plaintiffs "did not reside on their St. Martin Parish property at the time this case was commenced."

The action thus continued with the Arrested Plaintiffs pressing their claims against the District Attorney and Sheriff. The Arrested Plaintiffs moved for summary judgment on all of their claims; in response, the District Attorney sought summary judgment on mootness grounds, but otherwise declined to take a position on the constitutionality of the Infrastructure Trespass Statute. The Attorney General then successfully moved to intervene for the limited purpose of defending the statute's constitutionality.

The district court denied the Plaintiffs' and District Attorney's respective motions for summary judgment, but also issued a show-cause order as to why summary judgment for all Defendants was not proper. After receiving further briefing, the district court issued an opinion on March 28, 2024, that granted summary judgment for Defendants on all of the Arrested Plaintiffs' remaining claims. Plaintiffs timely appealed.

## II.    Standard of Review

All appealed issues in this matter are reviewed *de novo*. *See Moore v. Louisiana Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 962 (5th Cir. 2014) ("The question of whether state defendants are entitled to sovereign immunity is [] reviewed *de novo*."); *Sierra Club v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 555 (5th Cir. 1996) ("We review a district court's holding on the issue of standing *de novo*."); *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 257 (5th Cir. 2001) ("We review a summary judgment *de novo*, applying the same [Rule 56] standard as did the district court.").

## III.    Sovereign Immunity & Standing

Before reaching the merits, we must first evaluate which of the Plaintiffs and Defendants are proper parties to this dispute. As detailed

above, during this case's duration in the Middle District of Louisiana, the district court dismissed all claims against the Attorney General on sovereign immunity grounds. Later, during this case's pendency in the Western District of Louisiana, the district court (1) dismissed the Advocacy and Landowner Plaintiffs' claims for lack of standing, (2) found that the Arrested Plaintiffs had standing to press their facial challenges to the Infrastructure Trespass Statute, and (3) dismissed the Arrested Plaintiffs' as-applied claims on mootness grounds. We review each determination in turn.

## A. The Attorney General & Sovereign Immunity

During this case's duration in the Middle District of Louisiana, the district court dismissed all claims against the Attorney General on sovereign immunity grounds. Plaintiffs challenge that dismissal, asserting that the *Ex Parte Young* exception to sovereign immunity applies because of the Attorney General's status as (1) a mandatory supervisor of all district attorneys within the state, and (2) the legal advisor to the state's Office of Homeland Security and Emergency Preparedness.

A summary on how the *Ex Parte Young* exception operates may be a helpful precursor to our analysis. Ordinarily, the Eleventh Amendment's grant of sovereign immunity prohibits nonconsenting states from being sued by private litigants in federal forums. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). This bar also applies to suits against state agencies, as well as state officials sued in their official capacities. *Edelman v. Jordan*, 415 U.S. 651, 663–69 (1974) (extending sovereign immunity to state officers in their official capacities).

*Ex Parte Young* is an equitable exception that overcomes an invocation of sovereign immunity. 209 U.S. 123, 155–56 (1908). It permits suits against state officials that seek the enjoinment of a state law that allegedly conflicts with federal law. *Id.* at 159–60. The availability of the *Ex Parte Young*

exception is assessed as a threshold matter: the inquiry focuses on whether the operative complaint asserts requisite claims and forms of relief.

This court employs two concurrent analyses to determine whether the exception applies. First, and consistent with the "straightforward inquiry" endorsed in *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, we review "whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." 535 U.S. 635, 645 (2002). The parties agree that this requirement is satisfied: the operative complaint named the Attorney General in her official capacity, alleged that enforcement of the Infrastructure Trespass Statute violated the Due Process Clause and First Amendment, and sought enjoinment of the statute as prospective relief. *Ex Parte Young*'s application thus turns on the second requirement: whether the named official holds a sufficient "connection [to] the enforcement of the act." 209 U.S. at 157.

"What constitutes a sufficient connection to the enforcement is not clear from our jurisprudence." *City of Austin v. Paxton*, 943 F.3d 993, 998–1002 (5th Cir. 2019) (quotation omitted). "But some guideposts have emerged" from our caselaw, and those guideposts are sufficient to reject Plaintiffs' arguments for keeping the Attorney General as a party to this suit. *Texas All. for Retired Americans v. Scott*, 28 F.4th 669, 672–74 (5th Cir. 2022). As relevant here, the state official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Texas Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (quotation omitted).

Plaintiffs aver that the Attorney General's role includes a duty to serve as the "chief legal officer of the state," as well as the obligation to act as "prosecutorial and supervisory authority in legal cases." But the first rationale, standing alone, is insufficient because an official must have more

than a "general duty to see that the laws of the state are implemented" to trigger the *Ex Parte Young* exception. *City of Austin*, 943 F.3d at 999–1000 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)).

The second argument, that the Attorney General holds statewide supervisory authority over criminal prosecutions, fares slightly better. But "[p]anels in this circuit have defined 'enforcement' as 'typically involv[ing] compulsion or constraint." *Mi Familia Vota v. Ogg*, 105 F.4th 313, 332 (5th Cir. 2024) (second alteration original) (quoting *City of Austin*, 943 F.3d at 1000). Here, however, the Attorney General appears to be a constrained official with respect to enforcement of the Infrastructure Trespass Statute. The Louisiana Constitution delegates "charge of every criminal prosecution" to the applicable district attorney. LA. CONST. art. V, § 26(b). The Attorney General may only intervene "upon the written request of a district attorney, to advise and assist in the prosecution of any criminal cases." LA. CONST. art. IV, § 8. If the Attorney General wished to initiate a prosecution under the statute without approval from the applicable district attorney, she would have to receive "authoriz[ation] by the court which would have original jurisdiction." *Id.*

Crucially, Plaintiffs do not allege that any sort of enforcement has occurred here. That is fatal, because our caselaw requires "specific enforcement action *of the respective defendant state officials*" to apply the *Ex Parte Young* exception. *City of Austin*, 943 F.3d at 1001 (emphasis added) (collecting cases with state officials that "prohibit[ed] payment of claims," participated in "rate-setting," and "sen[t] letters threatening formal enforcement.").

The same concern applies to Plaintiff's fleeting invocation of the Attorney General's status as the legal advisor to the state's Office of Homeland Security and Emergency Preparedness. The agency, according to

No. 24-30272

Plaintiffs, "has the authority and mandate to protect critical infrastructure against threats." But the Attorney General's "general dut[y]" to advise that office does not necessarily make her "the enforcer of specific" infrastructure-related statutes. *Texas All. for Retired Americans*, 28 F.4th at 674.

At bottom, because Plaintiffs have neither demonstrated that the Attorney General has "the particular duty to enforce" the Infrastructure Trespass Statute, nor shown that she holds "a demonstrated willingness to exercise that duty," the *Ex Parte Young* exception to sovereign immunity does not apply. *Texas Democratic Party*, 978 F.3d at 179. The district court did not err in dismissing claims against the Attorney General from this suit.

## B.    The Plaintiffs and Standing

As for Plaintiffs, the district court concluded that the Advocacy and Landowner Plaintiffs had no standing for their claims, and that while the Arrested Plaintiffs did have standing for their facial and as-applied challenges, the expirations of the statute of limitations for violations of the Infrastructure Trespass Statute mooted their as-applied claims. We consider each of these determinations, while keeping the familiar standing requirements in mind. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) ("[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.").

### 1.    Advocacy Plaintiffs

Plaintiffs first contest the dismissal of the Advocacy Plaintiffs for lack of standing. They argue that the Advocacy Plaintiffs demonstrated a sufficient injury-in-fact because they previously "organized protests at pipelines" and alleged that "chilling activities caused by the criminal

penalties" of the Infrastructure Trespass Statute "will curtail their protest activities in the future."

But Plaintiffs acknowledge that the Advocacy Plaintiffs' alleged injuries are only "traceable to, and redressable by a court order against" the Attorney General—not the Sheriff or District Attorney. As discussed above, the *Ex Parte Young* exception does not apply, and accordingly, the Attorney General's sovereign immunity remains effective. That fact severs the causation and traceability elements that the Advocacy Plaintiffs require to have standing. The district court, accordingly, did not err in dismissing the Advocacy Plaintiffs from this lawsuit.

### 2. Landowner Plaintiffs

The Landowner Plaintiffs are differently situated from their Advocacy Plaintiff counterparts: they hold property interests in St. Martin Parish, and accordingly fall within the District Attorney and Sheriff's jurisdiction. But the district court concluded that they lacked an injury-in-fact because they failed to "allege that they participated in the protests of White Hat, Savage, and Mejía" and thus lacked participation in activities "arguably proscribed by the statute." The district court also noted that because the Landowner Plaintiffs did not specify that they would "participate in protests at the pipeline in the future," they lacked a "credible threat of prosecution."

It is true that prudential standing considerations prohibit the Landowner Plaintiffs from asserting injuries suffered by the Arrested Plaintiffs. In other words, the Aaslestads and Larsons cannot adopt the arrests of White Hat, Savage, and Mejía as their own injuries. But according to the evidentiary record, the Landowner Plaintiffs have maintained that they "granted the protestors permission to be on the property." In turn, the allegedly unlawful arrest of those protestors may infringe upon the right of the Landowner Plaintiffs to fully "control, use, [and] enjoy" their private

property—a benefit secured by the Louisiana Constitution. LA. CONST., art. I, § 4(A).

The detainment of the Arrested Plaintiffs may also inflict a First Amendment association injury upon the Landowner Plaintiffs. The First Amendment's associational protections stem from the understanding that "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances [cannot] be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends [is] not also guaranteed." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Here, the basic elements of an associational injury are present: the Landowner Plaintiffs offered their property interests to facilitate the ability of the (like-minded) Arrested Plaintiffs to engage in expressive freedoms, and Louisiana officials intruded upon that interest by effectuating arrests and threatening prosecution. While the Landowner Plaintiffs were not (and have no stated plans to be) physically present on the tract of land in question, the association right broadly protects "a correlative freedom to engage in group effort." *Id.*

At the same time, the Landowner Plaintiffs do not plead an intent to continue hosting protests on the implicated land tract. At best, the operative complaint expresses a "concern[] that they and other landowners, and guests they allow on their property," face some prospect of future prosecution under the statute. This court requires "sufficiently concrete plans," not just a passing reference to future conduct, to sustain an injury-in-fact for future injuries. *Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 271 (5th Cir. 2021). The district court accordingly did not err in finding that the Landowner Plaintiffs failed to state an injury-in-fact sufficient to avoid dismissal of their claims.

No. 24-30272

### D.    Arrested Plaintiffs

Lastly, the district court concluded that the Arrested Plaintiffs
satisfied the standing inquiry for both their facial and as-applied claims
because they "alleged that they were arrested and are still under the threat of
prosecution for violating [the Infrastructure Trespass Statute]."  It later
concluded that, because of the expiration of the statute of limitations for
charges associated with the 2018 protests, the Arrested Plaintiffs' as-applied
challenge to the Infrastructure Trespass Statute was moot.  On appeal,
Defendants allege that the Arrested Plaintiffs have not pled a sufficient
injury-in-fact to sustain either of their claims.  The Arrested Plaintiffs,
meanwhile, contest the dismissal of their as-applied challenge to the
Infrastructure Trespass Statute, alleging that the challenges are subject to the
"capable of repetition, yet evading review" exception to mootness.  The
exception has two requirements: first, there must be a "challenged action"
that "is in its duration too short to be fully litigated prior to cessation or
expiration," and second, there must be "a reasonable expectation that the
same complaining party will be subject to the same action again."  *Spencer v.
Kemna*, 523 U.S. 1, 17 (1998).

To start, the district court correctly determined that at the time they
filed suit, the Arrested Plaintiffs had standing to pursue their facial and as-
applied challenges to the Infrastructure Trespass Statute.  "[P]laintiffs
seeking injunctive and declaratory relief can satisfy the redressability
requirement only by demonstrating a continuing injury or threatened future
injury."  *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019).  As the district
court recognized, the Arrested Plaintiffs alleged two forms of injury: one
based on present conditions at the time of filing—"the specter of prosecution
for violating a potentially unconstitutional law," and one based on future
conduct—enforcement of the Infrastructure Trespass Law would have "a
chilling effect" on their "future protests of the Bayou Bridge Pipeline."  And

while the Defendants argue that the Arrested Plaintiffs "lack a sufficiently imminent injury and an injury that is traceable to Defendants," the Arrested Plaintiffs have alleged—as the district court noted—that "they desire to continue their protests over the Bayou Bridge Pipeline" but "have curtailed their activities because of their fear of prosecution under the amended" Infrastructure Trespass Statute.

Over the pendency of this litigation, however, the statute of limitations for the Arrested Plaintiffs' alleged violations of the Infrastructure Trespass Statute passed without charges from the District Attorney. The district court accordingly held that the Arrested Plaintiffs' as-applied challenges were moot. Plaintiffs contest this conclusion, alleging that their as-applied challenges are subject to the aforementioned "capable of repetition, yet evading review" exception to mootness. But while the second element is met, given Plaintiffs' self-professed intention to continue protesting; the first element is not. *Kemna*, 523 U.S. at 17. Simply stated, Plaintiffs are challenging an ordinary trespass prosecution brought by district attorneys; that action is not inherently "too short to be fully litigated prior to cessation and expiration" of the challenged action, and Plaintiffs do not advance any argument in support of such a theory. The district court accordingly did not err in dismissing the Arrested Plaintiffs' as-applied claims on mootness grounds.

## IV.    Due Process & Vagueness

Turning to the merits of their appeal, Plaintiffs first allege that the Infrastructure Trespass Statute is impermissibly vague, in violation of the Constitution's Due Process Clause. When assessing criminal statutes for vagueness, we employ the two-prong "test described in *City of Chicago v. Morales*." *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 507 (5th Cir. 2001) (citing *United States v. Escalante*, 239 F.3d 678, 680 (5th Cir.

No. 24-30272

2001)).  Under *Morales*, a criminal statute is unconstitutionally vague if either one of two prongs is satisfied: the statute "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," or it "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement."  527 U.S. 41, 56 (1999).  We assess each prong in turn.

## A.  Clarity of Prohibited Conduct

Plaintiffs argue that the Infrastructure Trespass Statute is impermissibly vague because the 2018 amendment "turned vast, unmarked stretches of land into critical infrastructure and exposed individuals to up to five years' imprisonment for remaining on such infrastructure after being forbidden."  This claim is primarily aimed at subsection (A)(3), which criminalizes "[r]emaining upon or in the premises of a critical infrastructure after having been forbidden to do so, either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person."  La. R.S. § 14.61(A)(3).  Plaintiffs claim that because there is no clarity as to what constitutes the premises of a pipeline, and because pipelines have ill-defined and unobvious features (*i.e.*, they may be underground and unmarked, or incorrectly marked), the subsection holds a substantial likelihood of criminalizing lawful conduct on, say, an unmarked, buried gas pipeline in a public park.

The Attorney General offers a two-part response.  First, she cites to and adopts the district court's limiting construction of subsection (A)(3).  In the proceedings below, the district court concluded that the subsection's condition precedent—that an "owner, lessee, or custodian of the property" would first have to "forbid[]" an individual—indicated that "premises" referred to "property over which the owner, lessee, or custodian of the critical infrastructure has the right under state law to control access to or otherwise exclude others from the property."  The district court then

concluded that the definition "does not exist with respect to the traditional public forums"—*i.e.*, public sidewalks, parks, or government buildings—"cited by Plaintiffs."[4]

Plaintiffs object to the district court's—and now, the Attorney General's—reading, and declare, in somewhat conclusory fashion, that premises "clearly does include public property." They specifically argue that the absence of "private" or a similar adjective in subsection (A)(3) means that the court's limiting construction violates the statute's plain text. But Plaintiffs' insistence that the Infrastructure Trespass Statute applies to the "125,000 miles" of pipeline across Louisiana is not exactly accurate, given that (1) the plain text of subsection (A)(3) requires an owner with "the right under state law" to exclude others, and the government's right of exclusion can vary depending on a forum's characteristics; and (2) the statute's First Amendment, recreation, and private ownership carveouts (subsections (E)(1)-(3)) prevent a significant number of leisurely activities from being transformed into criminal conduct. The district court's narrower interpretation is plausible, and a better reading of the statute when read as a whole, for those same reasons. And, as the district court explained, even if Plaintiffs' more expansive reading (that all pipelines and the area above them are fair game for prosecution) was also plausible, "the Court's construction of the statute avoids constitutional infirmities."

---

[4] The dissenting opinion objects to this conclusion, highlighting that "police or other government security officers ordinarily have the authority to exclude unauthorized entrants from government property." *Post* at 34. But in accordance with the limiting construction, the Attorney General has clarified that a prerequisite to enforcement of subsection (A)(3) is "(1) a pipeline construction site or pipeline on private property (or on public property that is not open to the public)." Said otherwise, the Attorney General has disclaimed enforcement of the statute on pipelines located on public property, unless that property "is not open to the public."

No. 24-30272

Plaintiffs, as well as the dissent, also emphasize that the district court's limiting construction does not rescue the statute from overbreadth claims "brought by Landowner Plaintiffs" over "interfere[nce] with their rights over their own private property." *See, e.g.*, *post* at 34–35. But this is not an insurmountable concern: for one, property documents will reveal who has authority over a tract of land, including the scope of any servitude rights. For two, rights-of-way in active construction areas, including the berm upon which two of the Arrested Plaintiffs protested, are usually demarcated with obvious markings, such as flags or signs. And in any event, vagueness is not determined through identification of "close cases," but rather, "the indeterminacy of precisely what [an incriminating fact] is." *United States v. Williams*, 553 U.S. 285, 305–06 (2008). The court's narrowing construction clarifies how the statute is to be construed, thus limiting any indeterminacy.

A third consideration parallels Louisiana's second argument for why the Infrastructure Trespass Statute is not impermissibly vague. The State points out that the crime contemplated by subsection (A)(3) requires the additional act of remaining and "refusing to leave the premises of a pipeline construction site or pipeline that is in a non-public forum after being forbidden by a person with the authority to exclude." The district court ruled on similar grounds, emphasizing that the charge is triggered "only *after* an authorized person instructs the trespasser to leave the premises."

Plaintiffs dispute that a warning can cure statutory vagueness, and quote *Wright v. Georgia*'s proposition that "one cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution." 373 U.S. 284, 291–92 (1963). But the "command" issued in *Wright* carried an exponentially high degree of unconstitutionality: the officers attempted to justify their "intention to enforce racial discrimination" by arguing that the petitioners, who were playing basketball at a public park, were breaching the peace. *Id.* at 292. The instant Plaintiffs,

No. 24-30272

in contrast, do not allege that the district court's limiting construction of the
Infrastructure Trespass Statute carries a similar likelihood of
unconstitutional application.  Thus, assuming that the district court's
limiting construction is enforced, an ordinary person would comprehend
what conduct is prohibited under the Infrastructure Trespass Statute.

## B.    Law Enforcement Guidance

With respect to the alternative path for finding vagueness in a criminal
statute, Plaintiffs argue that the Infrastructure Trespass Statute evinces "a
lack of law enforcement guidance."  It is correct that a "principal element of
the vagueness doctrine is 'the requirement that a legislature establish
minimal guidelines to govern law enforcement.'"  *United States v. Coleman*,
609 F.3d 699, 706 (5th Cir. 2010) (quoting *Kolender v. Lawson*, 461 U.S. 352,
357 (1983)).  But assuming that the district court's construction is correct,
there are objective standards for police officers to follow when enforcing the
statute.  As the state explains, enforcement of subsection (A)(3) has three
overlapping requirements: "(1) a pipeline construction site or pipeline on
private property (or on public property that is not open to the public) and (2)
a person who has refused to leave the construction site or pipeline right-of-
way despite (3) a request made by a person with legal authority."  These
requirements constitute "clear questions of fact," which generally limit the
"indeterminacy of what the [incriminating fact is]" that lies at the heart of
vagueness doctrine.  *Williams*, 553 U.S. at 306.

In response, Plaintiffs argue that individuals associated with every
defendant in this suit—the Attorney General, District Attorney, and two
arresting officers employed by the Sheriff—have "offered conflicting
interpretations of the Statute's scope."  But all of these "conflicting
interpretations," including those referenced by the dissent, *see post* at 36,
came before the district court issued, and the Attorney General adopted, the

20

No. 24-30272

limiting construction that clarifies the scope of the Infrastructure Trespass Statute.

Moreover, a close review of the allegedly "conflicting interpretations" reveals that Plaintiffs' claims are vastly overstated. For example, Plaintiffs allege that the following lines from the state's initial Motion to Dismiss suggest that the Attorney General "understood" that "premises" referred to "the *entirety* of each tract of land that a pipeline runs through."

> On a given tract of land, a pipeline exists or does not, a person is present on that tract or is not, and the person has been forbidden from remaining or not. Those facts are ascertainable, and they place a person on notice of what is forbidden. Nothing more is required.

But context is important: in those sentences, the Attorney General was completing an argument by summarizing how the statute, as a whole, was not vague. That generalization should not be construed as an attempt to precisely delineate the premises of the pipeline.

A similar principle applies to Plaintiffs' view of how the District Attorney interpreted the Infrastructure Trespass Statute. According to Plaintiffs' telling, the District Attorney claimed that the statute only "applied to critical infrastructure 'completely enclosed by any type of physical barrier.'" But the District Attorney made that statement as just one "example" for how the entire Infrastructure Trespass Statute, as a whole, was not vague. And while Plaintiffs point to the District Attorney's comment that that "premises" can be determined through a "technical" interpretation of "referring to an expropriation judgment containing the pipeline right of way," that statement was specifically made with regard to how the December 2018 expropriation judgment settled any vagaries

associated with fractional interests on the 38-acre tract of land in St. Martin Parish.

Meanwhile, the allegedly conflicting interpretations offered in depositions of the arresting officers were, in reality, responses to different questions.[5] Sergeant Martin testified, in response to a hypothetical "situation where there's a, supposedly, a pipeline underground that you can't see," that he "wouldn't enforce" the statute. Captain Gauthier, meanwhile, replied "I really don't know how to answer that question" to a more detailed—and somewhat perplexing—hypothetical involving an underground pipeline and "a landowner who's saying this person or –- or a pipeline company, which is saying that this -- these people are -- are on our pipeline and it's not a construction site." Indeed, in questions preceding the hypothetical, Gauthier outlined an analytical approach not dissimilar with Martin's approach: he would look at "survey lines placed there by the surveyors" to determine whether protestors had crossed into the right-of-way.

At bottom, Plaintiffs hold the burden of demonstrating that the Infrastructure Trespass Statute lacks "minimal guidelines to govern law enforcement" activities. *Kolender*, 461 U.S. at 357. But they do not dispute that the district court's limiting construction of the statute establishes a triad of factors that clarify subsection (A)(3)'s application. And Plaintiffs' claims of conflicting statutory interpretations from different law enforcement officials are overstated and immaterial, given the superseding guidance

---

[5] The dissent suggests that we "point[] to" the officers' statements for "the proposition that individual officers testifying that they personally would not enforce the statute provides a valid defense to vagueness." *Post* at 35. We disagree; we only reference the officers' testimony to provide complete context for their statements, in response to Plaintiffs' claims of "conflicting interpretations" among rank-and-file officers.

No. 24-30272

provided by the district court and adopted by the Attorney General. Plaintiffs have accordingly not met the requisite burden, and the district court did not err in rejecting their vagueness challenge.

## V.    First Amendment & Overbreadth

Plaintiffs lastly appeal the dismissal of their First Amendment facial challenge to the Infrastructure Trespass Law. That challenge is judged on whether "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723–24 (2024) (quoting *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021)). In the First Amendment context, "a law with a plainly legitimate sweep may be struck down in its entirety . . . [but] only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724 (quotation omitted).

To be sure, the standard is "still daunting." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013). Federal courts must take great care when "enjoin[ing] the enforcement of a state statute." *Chisom v. Roemer*, 853 F.2d 1186, 1189 (5th Cir. 1988). And an analysis of facial constitutionality "requires that 'every reasonable construction [] be resorted to, in order to save a statute from unconstitutionality." *Steen*, 732 F.3d at 387 (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012)).

Plaintiffs allege that the Infrastructure Trespass Statute is facially unconstitutional in two respects. First, they claim that the statute is a content-based law, such that it is presumptively unconstitutional absent narrow tailoring that is required under strict scrutiny. Second, they argue that the law is overbroad in application, such that it is presumptively unconstitutional. Each argument is addressed below in turn.

No. 24-30272

## A.  Content-Based Restriction

A restriction is content-based if it is "based on 'the specific motivating ideology or the opinion or perspective of the speaker.'"  *Reed v. Town of Gilbert*, 576 U.S. 155, 168–69 (2015) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).  The district court concluded, and Plaintiffs do not dispute, that the Infrastructure Trespass Statute primarily "addresses purely conduct"—specifically, "it is essentially a trespass statute that targets and provides enhanced protection for a specific type of real property."

But Plaintiffs maintain that the statute is content-based because (1) it contains a provision that arguably holds the potential for arbitrary, content-based enforcement, and (2) its genesis lies in an intent to prevent protestors from obstructing the construction of oil pipelines.  The first argument is a rather isolated reading of the statute's carveout provision, which reads:

> E. Nothing in this Section shall be construed to apply to or prevent the following:
>
> (1) Lawful assembly and peaceful and orderly petition, picketing, or demonstration for the redress of grievances or to express ideas or views regarding legitimate matters of public interest, including but not limited to any labor dispute between any employer and its employee or position protected by the United States Constitution or the Constitution of Louisiana.

La. R.S. § 14.61(E)(1).  Plaintiffs argue that subsection (E)(1)'s carveout, which protects the right to "express ideas or views regarding legitimate matters of public interest," arbitrarily gives an officer the authority to determine whether a protest advances "legitimate matters of public interest."

But that argument fails to consider the context in which the statutory text appears.  Subsection (E) evinces an intent to protect otherwise lawful

activities from prosecution.  The aforementioned subsection (E)(1) protects "[l]awful assembly and peaceful and orderly petition, picketing, and demonstration for the redress of grievances"—all protected First Amendment activities.  Subsection (E)(2) protects "recreational activities conducted in the open or unconfined areas around a pipeline," and Subsection (E)(3) preserves the right of private property owners to continue exercising all benefits associated with ownership.  As the Attorney General avers, then, the entirety of the subsection is best understood as a disclosure that the Infrastructure Trespass Statute "does *not* interfere with pre-existing Free Speech rights, property rights, or other lawful activities."

Indeed, Plaintiffs' argument does not consider the entirety of the sentence in which the identified phrase appears.  When read in context, the allegedly unconstitutional phrase ("legitimate matters of public interest") simply conditions the protected right that begins the sentence: "[l]awful assembly and peaceful and orderly petition, or demonstration."  La. R.S. § 14.61(E)(1).  The caveat simply acknowledges that not all speech is constitutionally protected (*i.e.*, speech that incites imminent lawless action, or true threats), and nothing more.

Separately, Plaintiffs argue that the Infrastructure Trespass Statute is content-based because "the amendments were motivated by viewpoint discrimination."  They specifically contend that the amendments stemmed from model legislation proposed by the Louisiana Mid-Continent Oil and Gas Association to discourage protest activity around pipeline construction areas. But the "contention that a statute is viewpoint based simply because its enactment was motivated by the conduct of the partisans on one side of a debate is without support."  *Hill v. Colorado*, 530 U.S. 703, 724 (2000).

Plaintiffs also allege that a legislative hearing that discussed First Amendment concerns surrounding the legislation was mere lip service, as

No. 24-30272

"the law that emerged" lacked an additional damage requirement that was
contemplated. But "inquiries into [legislative] motives or purposes are a
hazardous matter" when considering whether "to void a statute." *United
States v. O'Brien*, 391 U.S. 367, 383–84 (1968). That warning is particularly
acute when Plaintiffs' evidence primarily consists of hand-picked quotes
from a legislative hearing in which several lawmakers stated a general intent
to adopt a "belt and suspenders approach" and ensure that any amendments
did not "prevent or prohibit [persons wishing to peacefully protest] from"
demonstrating. And, as discussed below, the Legislature had a valid interest
in not only preventing damage to critical infrastructure, but also, limiting
trespass on those facilities. Plaintiffs have accordingly not met their burden
to demonstrate that the statute is a content-based restriction on speech.

## B.     Overbreadth

As for Plaintiffs' overbreadth challenge, "[t]he first step . . . is to
construe the challenged statute; it is impossible to determine whether a
statute reaches too far without first knowing what the statute covers."
*Williams*, 553 U.S. at 293. Here, Plaintiffs challenge the sweep of subsection
(A)(3), which criminalizes "[r]emaining upon or in the premises of a critical
infrastructure after having been forbidden to do so, either orally or in writing,
by any owner, lessee, or custodian of the property or by any other authorized
person." La. R.S. § 14.61(A)(3); *cf. SEIU, Local 5 v. City of Hous.*, 595 F.3d
588, 598 (5th Cir. 2010) ("the overbreadth doctrine applies on a *provision by
provision* basis").[6] As detailed above, the Attorney General has adopted the

---

[6] Note that because of the granular nature of Plaintiffs' facial challenge (they argue
that subsection (A)(3) is facially unconstitutional, but in the specific context of pipelines),
the facial challenge analysis can also be applied to resolve the merits of the Arrested
Plaintiffs' as-applied challenge. *But see* Section III.D, *supra* (dismissing the Arrested
Plaintiffs' as-applied challenge on mootness grounds).

district court's limiting construction of the subsection: that it generally refers to being present on "property over which the owner, lessee, or custodian of the critical infrastructure has the right under state law to control access to or otherwise exclude others from the property."

Applying that construction to three categories of areas that are contemplated under the statute—private property, traditional public forums, and non-public forums—demonstrates that subsection (A)(3) is not unconstitutionally overbroad. First, as to private property, landowners maintain their authority to exclude unwelcome third parties from their property. *See* La. R.S. § 14.61(E)(3). That is consistent with how modern property rights operate; after all, the "[Supreme] Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only." *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 568 (1972).

Second, as to state-owned, non-public forums (such as a government-owned nuclear power plant), officials retain the authority to nondiscriminatorily exclude persons or otherwise condition access to a facility. That, again, is consistent with how property rights function: "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. State of Fla.*, 385 U.S. 39, 47 (1966).

Lastly, in accordance with the district court's limiting construction, the Infrastructure Trespass Statute does not apply to traditional public forums, such as public sidewalks or parks. This is because a traditional public forum typically lacks an "owner, lessee, or custodian [with] the right under state law to control access or otherwise exclude others from the property." *See, e.g.*, *Melancon v. Trahan*, 94-0026, p. 7 (La. App. 3 Cir. 10/5/94); 645 So. 2d 722, 726, *writ den.*, 650 So. 2d 1183 (1995) (explaining that a Louisiana

trespass statute did not apply to individuals standing on "a *public* sidewalk") (original emphasis). And, as detailed above, the inclusion of subsections (E)(1) and (E)(3) further reinforces the notion that the Infrastructure Trespass Statute does not impede on recreational or First Amendment activities.

Once "the statute['s] cover[age]" is ascertained, the next step is to determine "whether the statute, as [] construed [], criminalizes a substantial amount of protected expressive activity." *Williams*, 553 U.S. at 293, 297. That analysis neatly dovetails with an intermediate scrutiny analysis, as the Infrastructure Trespass Statute is a content-neutral provision: it "serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). *See* Section V.A, *supra* (explaining why the statute is not a content-based restriction).

Because Plaintiffs' planned protest activities encompass both "speech and nonspeech" elements, the *O'Brien* analytical framework, which addresses whether "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms," is applicable. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 286 (5th Cir. 2001) (quoting *O'Brien*, 391 U.S. at 378). Under the framework, a regulation will survive intermediate scrutiny if four factors are met:

> (1) it is within the constitutional power of the government, (2) it furthers an important or substantial governmental interest, (3) the interest is unrelated to the suppression of [] expression, and (4) the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest.

*Id*. Keeping the district court's limiting construction in mind, the first two factors are easily met: the government has the authority to enact nondiscriminatory laws that criminalize trespass, and the statute serves the important interest of discouraging trespass on facilities that hold critical infrastructure (both to avoid disruption of utilities and to limit injury to trespassers).

The third factor is also easily resolved in Defendants' favor: while Plaintiffs claim that the statute is necessarily "related to the suppression of free expression," the analysis focuses on the stated governmental "interest"—here, in preventing trespass. *O'Brien*, 391 U.S. at 378. And expressive speech does not transform prohibitions on otherwise unlawful conduct, including trespass, into the "suppression of free expression," as Plaintiffs put it. *See, e.g.*, *Virginia v. Hicks*, 539 U.S. 113, 123 (2003) (explaining that an individual was being "punished as a trespasser" for his "nonexpressive *conduct* . . . not his speech") (original emphasis); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 296 (1984) (emphasizing that a camping ban protected an interest in "limit[ing] the wear and tear on park properties," and that interest was "unrelated to suppression of expression" even though protestors claimed an expressive right to "enhance [their] message concerning the plight of the poor and homeless" by protesting in a park).

The parties differ as to the final *O'Brien* factor—whether the "incidental restrictions on First Amendment activity are no more than is necessary" to facilitate the governmental interest. Plaintiffs contend that in "penalizing unauthorized entry onto critical infrastructure before those structures can be damaged or otherwise compromised," the Infrastructure Trespass Statute is a "[b]road prophylactic rule[] in the area of free expression." But the limiting construction, as applied to the context of where critical infrastructure is located (a government-owned property, but

nonpublic forum), passes constitutional muster because "the State [is] no less than a private owner of property" and thus "has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley*, 385 U.S. at 47. Simply stated, the statute is nothing like the measure in *Button*, which forbade the "improper solicitation of any legal or professional business" and thus touched on the expression and association rights of those seeking legal assistance from the NAACP.

In the proceedings below, Plaintiffs also offered examples of "content-neutral alternative laws" that have a higher threshold for triggering criminality (*i.e.*, statutes that criminalize damage to infrastructure facilities, as opposed to presence near them). But as the district court explained, the state's interest is not just in ensuring that critical infrastructure remains undamaged, but also, in "regulating entry on the premises of critical infrastructure." That concern is understandable—after all, there are ways to disrupt the utilities that "critical infrastructure" facilitates without necessarily damaging infrastructure itself. For example, flipping an "off" switch on a circuit does not necessarily damage the circuit's infrastructure, but could cause widespread power outages. And in any event, intermediate scrutiny does not demand that a government institute "the least restrictive or least intrusive means" to further its governmental interests. *Ward*, 491 U.S. at 798.

At bottom, then, there is simply no "lopsided ratio" between unconstitutional and constitutional applications of subsection (A)(3), even if focused on the singular context of pipelines. *United States v. Hansen*, 599 U.S. 762, 770 (2023). "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Hicks*, 539 U.S. at 124. That principle holds true here, and

No. 24-30272

the district court did not err in dismissing Plaintiffs' facial challenges to the Infrastructure Trespass Statute.

## VI.   Conclusion

For the reasons discussed above, we AFFIRM the district court's grant of summary judgment in the Defendants' favor.

No. 24-30272

Stephen A. Higginson, *Circuit Judge*, dissenting:

The state of Louisiana contains over 125,000 miles of pipeline, running under and on private property, highways, sidewalks, waterways, and other public areas. A 2018 revision to the state's Infrastructure Trespass Statute, which prohibits "unauthorized entry of a critical infrastructure," La. Rev. Stat. 14.61(A), broadened the definition of "critical infrastructure" to include such pipelines without limitation.[1] The district court and the majority, recognizing that applying the statute to all 125,000 miles of pipeline could be unconstitutionally vague, have adopted a narrowing construction exempting public forums from the statute. But even if this interpretation was grounded in the text of the statute, the narrowing construction still does not save from vagueness the class of claims brought in this very case—that is, claims in which an arrestee under the statute was invited by a landowner onto private property while the entity enforcing the statute against the arrestee was itself unlawfully trespassing.

Because the statute does not give notice of what conduct is actually prohibited, it is unconstitutionally vague, and I respectfully dissent.[2]

Subsection (A)(3) of the Infrastructure Trespass Statute criminalizes "[r]emaining upon or in the premises of a critical infrastructure after having

---

[1] Critical infrastructure previously included "chemical manufacturing facilities, refineries, electrical power generating facilities, electrical transmission substations and distribution substations, water intake structures and water treatment facilities, natural gas transmission compressor stations, liquified natural gas (LNG) terminals and storage facilities, natural gas and hydrocarbon storage facilities, and transportation facilities[.]" La. Stat. Ann. § 14:61(B)(1) (2017). The 2018 revision added to this list pipelines, which were defined as "flow, transmission, distribution, or gathering lines, regardless of size or length, which transmit or transport oil, gas, petrochemicals, minerals, or water in a solid, liquid, or gaseous state." La. Rev. Stat. § 14:61(B)(3).

[2] I concur with the remainder of the majority's analysis.

been forbidden to do so, either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person." La. Rev. Stat. § 14.61(A)(3). Critical infrastructure includes, but is not limited to, pipelines. Subsections (A)(1) and (A)(4) of the same statute make liable those who "[i]ntentional[ly] ent[er]" into an area "completely enclosed by any type of physical barrier." *Id.* § 14.61(A)(1), (A)(4). A similar statute in Oklahoma, adopted in 2017, requires a "willful[]" state of mind and defines critical infrastructure as "enclosed by a fence" or "other physical barrier." Okla. Stat. § 21-1792. The newly added subsection (A)(3), however, contains no such clarifications in scope either as to the mental state of the arrestee or the visibility of the infrastructure.

A criminal statute is unconstitutionally vague when "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). By the text of Louisiana's new, "enhanced," felony trespass statute, an individual could be criminally prosecuted for sitting on a public park bench situated over an underground pipeline if an officer asks him to leave for any reason—even if those reasons are racially motivated and unrelated to critical infrastructure. Or an individual could be criminally prosecuted if she is invited onto private property by her friend and told to leave by a fractional owner unknown to her. Under the plain text of the statute, an individual could even be criminally prosecuted for protesting *on their own property* if a co-owner of the property instructs them to stop. Oral Arg. at 31:25 (not contesting that landowners could become felons if they weren't certain about the easement).

The majority opinion adopts the district court's reading that the term "premises" does not apply "with respect to the traditional public forums." *See ante* at 18. The majority focuses on the fact that an Infrastructure Trespass Statute defendant must have been excluded from a premises by an

"owner, lessee, or custodian," suggesting that such an owner "does not exist" on "public sidewalks, parks, or government buildings." *Id.* But there is no basis in the text of the statute for this limitation. The full text of the statute provides what is effectively an exclusionary right to "any owner, lessee, or custodian of the property or . . . any other authorized person." La. Rev. Stat. § 14.61(A)(3). The majority's reading suggests that government buildings have no custodians. But plainly, police or other government security officers ordinarily have the authority to exclude unauthorized entrants from government property.

A court-grafted public exception has a second problem: it overlooks Louisiana's applications of the statute. The complaint alleges that the statute was used by private security to arrest three individuals paddling on navigable waters, and that the individuals were made to post bond by the St. Martin Parish Sheriff's Office. *White Hat v. Landry*, 6:20-cv-00983, Docket Entry No. 1 at 24 (W.D. La. May 22, 2019). "We will not rewrite a law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain." *United States v. Stevens*, 559 U.S. 460, 481 (2010) (cleaned up). Although we may apply a narrowing construction, we should only do so when the statute is "easily susceptible" to a constitutional construction. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216–17 (1975). But law enforcement officers applying the statute on public waterways suggests that the statute is not "easily susceptible" to the majority's interpretation; indeed, it may "invite[] arbitrary enforcement." *Johnson*, 576 U.S. at 595. And neither Appellees nor the majority offer any basis in case law for reading such a restriction into the statute.

Even if the narrowing construction could cure vagueness issues as to presence on public property, enforcement on private property is similarly vague. The majority suggests that the statutory requirement that an individual be "forbidden to" "remain[] upon or in the premises" cures any

vagueness via a warning. La. Rev. Stat. § 14.61(A)(3). But this reasoning is vulnerable to serious problems. "One cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution." *Wright v. Georgia*, 373 U.S. 284, 291–92 (1963). In *City of Chicago v. Morales*, 527 U.S. 41 (1999), the Supreme Court held that a criminal loitering statute allowing officers discretion to determine whether association was purposeful or amounted to loitering did "not provide sufficiently specific limits on the enforcement discretion of the police[.]" *Id.* at 64. The Court observed that "[f]riends, relatives, teachers, counselors, or even total strangers might unwittingly engage in forbidden loitering if they happen to engage in idle conversation with a gang member," and a dispersal order could not cure this vagueness. *Id.* at 63. Similarly, individuals may "unwittingly engage in forbidden" trespass as an invitee of a fractional property owner by standing near a hidden pipeline.

The majority points to testimony by individual officers that they would not enforce the statute on an underground pipeline, or that they would look to "survey lines placed there by the surveyors" to determine trespass. *Ante* at 22–23. But there is no authority to support the proposition that individual officers testifying that they personally would not enforce the statute provides a valid defense to vagueness. *See Morales*, 527 U.S. at 63 (rejecting the defense that "the police have adopted internal rules limiting their enforcement to certain designated areas in the city"). And looking to the survey lines itself creates problems when ownership and land tract information is not precisely or readily available. Indeed, in this case, Bayou Bridge Pipeline contacted the police to remove the arrested plaintiffs, claiming to have a right of way to the pipeline. But the Louisiana state courts, after years of litigation over ownership of private tracts, found that Bayou Bridge Pipeline itself was in fact the trespasser. *Compare Bayou Bridge Pipeline, LLC v. 38.00 Acres, More or Less, Located in St. Martin Par.*, 320 So.

3d 1054, 1056 (La. 2021), *with* Oral Arg. at 31:30 (the Attorney General's argument that "landowners . . . would know the easement and the right of way"). The majority's interpretation of the statute functionally forces anybody on private property to vacate when instructed by any enforcer—even when there is no proof that a pipeline runs below, or that the enforcer has a right to enforce—or risk criminal prosecution. The result is the application before us, where the arrested plaintiffs were arrested for trespass on the word of the actual trespasser.

Even the Attorney General has failed to offer a consistent and precise interpretation of the statute. Before the district court, in motion to dismiss briefing, the Attorney General represented that "[o]n a given tract of land, a pipeline exists or does not, a person is present on that tract or is not, and the person has been forbidden from remaining or not." As to public forums, the Attorney General stated there was a "careveout [sic] for '[l]awful assembly.'" But at summary judgment, the Attorney General claimed that the district court had properly construed the statute "as limited to private property and non-public forums," and also pointed to a First Circuit holding that a "First Amendment carveout is sufficient to defeat standing absence [sic] evidence of prosecutions under similar facts." Not only has there been an arrest on public waterways under this statute, but the Attorney General's changing definition of the statutory coverage shows that the legislature has not "establish[ed] minimal guidelines to govern law enforcement." *Smith v. Goguen,* 415 U.S. 566, 574 (1974).

When even a property owner cannot be aware, from the text of the statute, whether she might be criminally prosecuted for trespass if told to leave her own property, the statute is vague in some of its applications. While some applications of the statute are clear—such as an uninvited individual damaging a clearly marked pipeline after being instructed to leave private property—a vague statute cannot be saved "merely because there is some

No. 24-30272

conduct that clearly falls within the provision's grasp." *Johnson*, 576 U.S. at 602.

I would hold that, taken together with (B)(3)'s definition of all pipelines as critical infrastructure, subsection (A)(3) of the Infrastructure Trespass Statute is unconstitutionally vague. Accordingly, I respectfully dissent.

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 20, 2025

Lyle W. Cayce
Clerk

Certified as a true copy and issued
as the mandate on Aug 19, 2025

Attest:   *Lyle W. Cayce*

Clerk, U.S. Court of Appeals, Fifth Circuit

No. 24-30272

————————

Anne White Hat; Ramon Mejia; Karen Savage; Sharon
Lavigne; Harry Joseph; John Lambertson; Peter
Aaslestad; Theda Larson Wright; Alberta Larson
Stevens; Judith Larson Hernandez; RISE St. James; 350
New Orleans; Louisiana Bucket Brigade,

*Plaintiffs—Appellants,*

*versus*

Elizabeth B. Murrill, *in her official capacity as Attorney General of
Louisiana*; M. Bofill Duhe, *in his official capacity as District Attorney of
the 16th Judicial District Attorney's Office*; Becket Breaux, *in his official
capacity as Sheriff of St. Martin Parish*,

*Defendants—Appellees.*

————————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:20-CV-983

————————————————————

Before Graves, Higginson, and Wilson, *Circuit Judges*.

J U D G M E N T

This cause was considered on the record on appeal and was argued by
counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED.

IT IS FURTHER ORDERED that Appellants pay to Appellees the costs on appeal to be taxed by the Clerk of this Court.

The judgment or mandate of this court shall issue 7 days after the time to file a petition for rehearing expires, or 7 days after entry of an order denying a timely petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, whichever is later. See Fed. R. App. P. 41(b). The court may shorten or extend the time by order. See 5th Cir. R. 41 I.O.P.

STEPHEN A. HIGGINSON, *Circuit Judge*, dissenting.

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

August 19, 2025

Mr. Daniel J. McCoy
Western District of Louisiana, Lafayette
United States District Court
300 Fannin Street
Suite 1167
Shreveport, LA 71101-0000

No. 24-30272   White Hat v. Murrill
USDC No. 6:20-CV-983

Dear Mr. McCoy,

Enclosed is a copy of the judgment issued as the mandate and a copy of the court's opinion.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Melissa V. Mattingly, Deputy Clerk
504-310-7719

cc:
    Mr. Glenn B. Adams
    Mr. Jorge Benjamin Aguinaga
    Mr. Ralph Roger Alexis III
    Mr. Baher Azmy
    Mr. Patrick B. McIntire
    Mr. Corey D. Moll
    Ms. Elizabeth Baker Murrill
    Mr. William P. Quigley
    Ms. Astha Sharma Pokharel
    Ms. Pamela Carol Spees